IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FRANK A. KING and PAULA S. ELMORE
f/k/a PAULA S. KING,

      Plaintiffs,

    vs.                               Civ. No. 13-862  JCH/LAM

ESTATE OF NORMAN L. GILBREATH,
DECEASED, LORETTA E. GILBREATH,
GILBREATH ENERGY, LLC, ENERGEN
RESOURCES CORPORATION, ROBERT L.
BAYLESS, PRODUCER LLC, ANIMAS
ENERGY GROUP, LLC, JAMES M. MARTIN,
SAN JUAN BASIN PROPERTIES, LLC a/k/a
SAN JUAN BASIN OPERATING a/k/a
SAN JUAN BASIN RESOURCES, TOP
OPERATING COMPANY, MARALEX
RESOURCES, INC., JOHN DOES I-X, AND
ALL UNKNOWN PERSONS WHO MAY
CLAIM A LIEN, INTEREST OR TITLE
ADVERSE TO PLAINTIFFS,

      Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the following motions:  *Plaintiffs' Motion for Partial Summary Judgment—Adverse Possession* [Doc. 183]; and *Plaintiffs' Motion for Partial Summary Judgment—Mineral Ownership and Lease Termination* [Doc. 180].

In this Memorandum Opinion and Order, the "Gilbreath Defendants" refers to:  Loretta E. Gilbreath, Personal Representative of the Estate of Norman L. Gilbreath, Deceased; Loretta E. Gilbreath; and Gilbreath Energy, LLC.[1]   The "Energen Defendants" refers to:   Energen

---

[1] Although some references herein are to time periods before Gilbreath Energy was created, and therefore refer to Norman and Loretta Gilbreath alone, when that distinction is not relevant the Court refers generally to the "Gilbreath Defendants."

Resources Corporation ("ERC"); James M. Martin; San Juan Basin Properties, LLC a/k/a San Juan Basin Operating a/k/a San Juan Basin Resources; TOP Operating Company; and Maralex Resources, Inc.  "Bayless and Animas" refers to:  Robert L. Bayless, Producer LLC, and Animas Energy Group LLC.

## FACTUAL BACKGROUND[2]

Plaintiffs filed suit seeking a determination that the Oil and Gas Lease ("Lease") they executed to Rodney P. Calvin, which was later assigned to Defendants Loretta and Norman Gilbreath, terminated.  Plaintiffs seek damages for revenues owed from wells attributable to Plaintiffs' mineral interest.

Pursuant to a March 2, 1973 "Mineral Deed" from A.L. and Reba Duff, Plaintiff Frank King acquired the minerals underlying the following lands in San Juan County, New Mexico:

Township 30 North, Range 11 West, NMPM
Section 19:  W/2NW/4SE/4, except 1.63 acres, more or less
Containing 18.37 acres, more or less

[Doc. 184-2]  Before this deed was executed, Plaintiffs[3] had entered into the Oil and Gas Lease dated August 4, 1972 ("Lease"), conveying an interest in part of these minerals to Rodney P. Calvin.  [Doc. 184-1]  The Lease conveyed an interest in the minerals "from the surface of the earth to the base of the Pictured Cliffs Formation only"—referred to herein as the "Subject Minerals."  [Doc. 182-1, p. 1, ¶ 21]  The lessee agreed to pay a royalty of 1/8.

The primary term of the Lease was three years; the Lease would continue "as long thereafter as oil or gas or casinghead gas or either or any of them, is produced therefrom; or as

---

[2] The following summary sets forth a general statement of facts.  When additional facts are relevant to a particular motion, the Court views the facts in the light most favorable to the nonmovant on that particular motion.
[3] Plaintiffs had been married but were divorced in 1971; however, they signed the Lease in 1972 as "Frank A. King" and "Paula S. King," husband and wife.  [Doc. 95, p. 2; Doc. 182-3]  Frank King was divorced when the 1973 deed was executed.  On December 28, 2006, Frank King conveyed a 50% interest in the minerals (including the Subject Minerals) to his then ex-wife, Paula S. Elmore.  [Doc. 182-14]

much longer thereafter as the lessee in good faith shall conduct drilling operations thereon and should production result from such operations, this lease shall remain in full force and effect as long as oil or gas or casinghead gas, shall be produced therefrom."  The Lease further provides:

> 16.  If within the primary term of this lease production on the leased premises shall cease from any cause, this lease shall not terminate provided operations for the drilling of a well shall be commenced before or on the next ensuing rental paying date; or, provided lessee begins or resumes the payment of rentals in the manner and amount hereinbefore provided.  If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and, if production results therefrom, then as long as production continues.
>
> 17.  It is agreed that this lease shall never be forfeited or cancelled for failure to perform in whole or in part any of its implied covenants, conditions, or stipulations until it shall have first been finally judicially determined that such failure exists, and after such final determination, lessee is given a reasonable time therefrom to comply with any such covenants, conditions, or stipulations.

Under this Lease, Calvin drilled the Wright #1 Well in the Pictured Cliffs Formation. The lessee's interests were assigned to Norman and Loretta Gilbreath on March 1, 1985. Norman and Loretta Gilbreath, and later their assignee Gilbreath Energy, LLC, were operator of the Wright #1 Well.

In July 1994, the New Mexico Oil Conservation Division issued an order stating that it pooled all mineral interests in the Basin-Fruitland Coal Gas Pool, including the Subject Minerals, for the drilling of the Flora Vista #2 Well.  [Doc. 189-3]  Plaintiffs were not given notice of this proceeding.  The Flora Vista #2 Well was drilled in 1994.  The Flora Vista #3 Well was drilled in 2004.

## PROCEDURAL BACKGROUND

Plaintiffs filed a complaint on September 10, 2013.  [Doc. 1]  Pursuant to the Court's order [Doc. 72], Plaintiffs filed the First Amended Complaint ("FAC") on May 27, 2014.  [Doc. 75]  The FAC asserts ten counts:  Count One—Declaratory Relief; Count Two—Quiet Title; Count Three—Accounting; Count Four—Breach of NMSA 1978, § 70-2-18(B); Count Five—Trespass; Count Six—Conversion; Count Seven—Breach of Fiduciary Duty; Count Eight—Unjust Enrichment; Count Nine—Oil and Gas Proceeds Payment Act; Count Ten—Negligence. [Doc 75]

On October 15, 2014, Plaintiffs moved to file a Second Amended Complaint ("SAC"). [Doc. 153]  The Court granted the motion.  [Doc. 278]  The SAC was filed on May 22, 2015. [Doc. 279]  The SAC added two additional counts:  Count Eleven—Fraud, against the Gilbreaths; and Count Twelve—Uniform Fraudulent Transfer Act Violation, against the Gilbreath Defendants.  [Doc. 279, pp. 13-16]  Because two new claims were added, the Court granted the Gilbreath Defendants' request for further discovery and extension of deadlines, for the two new claims only; the Amended Scheduling Order set the deadline for discovery as September 1, 2015; the deadline for discovery motions as September 15, 2015; and the deadline for other pretrial motions as November 15, 2015.  [Doc. 286]  The Court also vacated the July 20, 2015 trial date.

Then on September 25, 2015, the parties filed a stipulation dismissing the two new claims, Counts Eleven and Twelve.  [Doc. 308]  On October 1, 2015, the Court dismissed Count Eleven and Count Twelve in accordance with this stipulation.  [Doc. 311]  This Order also dismissed Defendant Loretta E. Gilbreath and Successor Trustees, Trustee of the Norman L. Gilbreath and Loretta E. Gilbreath Trust dtd 2/2/06 and Trusts A, B and C Thereof, with

prejudice, and stated that each party was to bear its own costs and attorneys' fees, except for the award pursuant to the Court's September 1, 2015 Order [Doc. 301].

On May 9, 2014, the Gilbreath Defendants filed crossclaims.  [Doc. 67]  Count III, concerning only the Flora Vista Wells, asserts a crossclaim for Breach of Fiduciary Duty against the Energen Defendants.  [Doc. 67, pp. 11-12, ¶¶ 41-45]  On September 29, 2015, the Court granted the *Energen Defendants' Motion for Partial Summary Judgment No. 3:  Gilbreath Defendants' Crossclaim for Breach of Fiduciary Duty*.[4]  [Doc. 197; Doc. 310]

The Court concludes that it has diversity jurisdiction under 28 U.S.C. § 1332.  Plaintiffs are citizens of Texas and all Defendants are citizens of different states.  [Doc. 279, pp. 1-3]  The SAC alleges that the amount in controversy exceeds $75,000, and Defendants, though answering with conclusory denials, make no argument that the damages claim was asserted in bad faith or was otherwise insufficient.  [Doc. 282, p. 2, ¶ 4]  *See Marchese v. Mt. San Rafael Hosp.*, 24 Fed. Appx. 963, 964 (10th Cir. 2001) (unpublished)[5] (stating that general allegation of damages exceeding $75,000 is sufficient absent showing claim was asserted in bad faith); *see also McPhail v. Deere & Co.*, 529 F.3d 947, 954-55 (10th Cir. 2008) (stating general rule that allegation that amount exceeds $75,000 is sufficient, unless there is "a legal certainty" that claim cannot amount to $75,000).  In addition, the pretrial order submitted by the parties on the FAC does not state that the amount in controversy is contested for subject matter jurisdiction.  [Doc. 273, p. 3]  *See Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1182-83 (10th Cir. 2000) (stating that pretrial order's finding jurisdiction was appropriate supersedes pleadings and

---

[4] The crossclaim is also asserted against Defendant Robert L. Bayless, Producer LLC, who did not join in the Energen Defendants' motion.  [Doc. 67, pp. 1-2]

[5] The Court cites this and other unpublished opinions for their persuasive value.  *See* 10th Cir. R. 32.1(A).

constitutes proper allegation of jurisdiction even if complaint were inadequate).   The Court further concludes that it has jurisdiction over the crossclaims under Federal Rule of Civil Procedure 13(g).

## LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could have an effect on the outcome of the suit.  *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014).  A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the non-moving party.  *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that party.  *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007).  The court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

A party seeking summary judgment bears the initial burden of showing that there is no genuine dispute as to a material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  When that party does not have the burden of persuasion at trial, it can satisfy its burden at the summary judgment stage by identifying a lack of evidence on an essential element of the claim.  *Id*. at 671.  If the movant satisfies its burden, the burden shifts to the non-movant.  *Id*.

The party opposing summary judgment cannot rest on the pleadings, but must go beyond the pleadings and "designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment."

*Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The non-movant must "set forth specific facts" from which a rational trier of fact could find in the non-movant's favor, identifying those facts in the affidavits, deposition transcripts, or incorporated exhibits.  *Adler*, 144 F.3d at 671 (internal quotation marks omitted).  The party cannot rest on ignorance of the facts, on speculation, or on unsubstantiated conclusory allegations.  *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  "A fact is 'disputed' in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it; a simple denial, much less an assertion of ignorance, does not suffice."  *Grynberg v. Total S.A.*, 538 F.3d 1336, 1345 (10th Cir. 2008).

I.     ***Plaintiffs' Motion for Partial Summary Judgment—Adverse Possession*** **[Doc. 183]**

Plaintiffs filed *Plaintiffs' Motion for Partial Summary Judgment—Adverse Possession*. [Doc. 183]  The motion is directed against the Gilbreath Defendants' affirmative defenses and counterclaims asserting adverse possession of the Subject Minerals.  [Doc. 229]  The Gilbreath Defendants filed a response [Doc. 222], and Plaintiffs filed a reply [Doc. 245].  Having reviewed the motion, briefs, evidence, and relevant law, the Court concludes that the motion should be granted.

In their answer to the FAC, the Gilbreath Defendants counterclaim for adverse possession of the Subject Minerals:

> 5.  The Gilbreaths and the Gilbreath Estate have continuously and in good faith under color of title occupied and exercised dominion and control over the surface and oil and gas interest described in Exhibit A [copy of the Lease].

> 6.  The Gilbreaths and the Gilbreath Estate for more than ten years, continuously occupied the surface and oil and gas interest in the property in an open, hostile manner under color of title, and they claim rights inconsistent and hostile to those rights claimed by Plaintiffs [King/Elmore].

7

7.   The Gilbreaths and the Gilbreath Estate have paid all taxes for the surface and oil and gas interest for more than ten years for the property described on Exhibit A.

8.   The Gilbreaths and the Gilbreath Estate's actual and visible activities of possession, dominion and control of the property, which is the subject of this lawsuit, included but are not limited to, drilling, development and production of oil and gas for a continuous period of more than ten years.

9.   Plaintiffs, King/Elmore have not availed themselves of the benefit of any title, legal or equitable, brought no claims for rights, title and interest to the subject property within ten years of the Gilbreaths and the Gilbreath Estate's open, hostile and adverse possession which began in March of 1985.

[Doc. 114, p. 11]  The Gilbreath Defendants also raise as an affirmative defense the claim that they acquired ownership of the Subject Minerals through adverse possession.[6]

Plaintiffs argue that they are entitled to summary judgment on this issue, because the Gilbreath Defendants have the burden of proof on adverse possession and the Gilbreath Defendants do not identify evidence to prove each element by clear and convincing evidence.

### A.  Legal Standards for Adverse Possession

The Gilbreath Defendants base their adverse possession claims on the New Mexico statute, NMSA 1978, § 37-1-22 (1857).  The New Mexico Supreme Court states that its adverse possession statute is "complemented and amplified" by case law, and is a synthesis of statutory and decisional law.  *In re Estate of Duran*, 2003-NMSC-008, ¶ 9, 66 P.3d 326, 330.  A party claiming ownership by adverse possession must prove, by clear and convincing evidence, actual and visible appropriation, under color of title and claim of right hostile to the claim of another, that was continuous for ten years, in good faith, and included payment of taxes.  *City of Rio*

---

[6] The answers to the FAC and SAC claim the following as an affirmative defense:  "Plaintiffs' claim of Quiet Title and other claims against the Gilbreaths and the Gilbreath Estate should be dismissed based on adverse possession. The Gilbreaths and the Gilbreath Estate have continuously and in good faith and under color of title possessed and exercised dominion and control over the surface and oil and gas interest described in the August 4, 1972 lease for more than ten years and the Gilbreaths and the Gilbreath Estate's control and dominion over the surface and oil and gas interests were open, notorious and hostile to any interest or claim by the Plaintiffs to the surface and oil and gas interests and the Gilbreaths and the Gilbreath Estate have paid all taxes for more than a ten year period on the surface and oil and gas interest."  [Doc. 114, p. 9, ¶ 32; Doc. 282, p. 10, ¶ 32]

*Rancho v. Amrep Sw. Inc.*, 2011-NMSC-037, ¶ 21, 260 P.3d 414, 421-22.   A party claiming adverse possession has the burden of proving all of these elements.   *Id.*; *In re Estate of Duran*, 2003-NMSC-008, ¶ 8, 66 P.3d 326, 330; *Slemmons v. Massie*, 1984-NMSC-108, ¶ 6, 690 P.2d 1027, 1028.  "If any one of the elements necessary to establish title to land by adverse possession is missing, the claimant will not obtain title."  *Hernandez v. Cabrera*, 1998-NMCA-064, ¶ 6, 759 P.2d 1017, 1018.

### B.  Discussion of Adverse Possession:  the "continuous" element

Plaintiffs argue that the Gilbreath Defendants' possession of the Subject Minerals was not "continuous," because there were several years of no production and no operations.  Plaintiffs set forth as allegations of fact:

> 8.  Production of oil or gas from the Wright #1 Well occurred initially, and then ceased for the periods of May 1990 through February 1991, April 1991 through February 1996, August 1998 through October 1998, June 1999 through February 2004, April 2004 through January 2006, and April 2006 through October 2006.  *See*, Exhibit "F" and G" Wright #1 Well production histories; Exhibit "H" August 12, 2014 deposition of Loretta Gilbreath, 51:1-13, 52:9-25, 53:1-5, 88:11-25, 89:1-8; Exhibit "I" Gilbreath Energy, LLC answers to Plaintiffs' Request for Admission Nos. 7 and 8; Exhibit "J" Gilbreath Estate answers to Plaintiffs' Request for Admission Nos. 7 and 8.

> 9.  The Gilbreath Defendants have no evidence of their conducting any operations on the Wright #1 Well in May 1990 through February 1991, April 1991 through February 1996, August 1998 through October 1998, June 1999 through August 2003, January 2005 through January 2006 and April 2006 through October 2006.  *See*, Exhibit "H" Loretta Gilbreath deposition, 53:6-9, 11, 61:8-11; Exhibit "K" August 13, 2014 deposition of Kathy Belcher, corporate representative of Gilbreath Energy, LLC, 107:8-25, 108:1-23, 130:21-25, 131:1-19; Exhibit "I" and "J" Gilbreath Defendant responses to Plaintiffs' Request for Admission Nos. 10-12.

[Doc. 184, pp. 3-4]  Production summaries for the Wright #1 Well are attached as exhibits; these production summaries support the allegations in Paragraphs 8 and 9 quoted above.  In the cited portions of the deposition of Loretta Gilbreath ("LG"), she admitted that the production history

showed no production for periods of time; LG also admitted that she did not know whether the Gilbreath Defendants produced oil or gas continuously from the Wright #1 Well from 2003 to 2013.  [Doc. 184-8, pp. 2-3, 7-8]

The Gilbreath Defendants dispute the allegations quoted above, admitting that there was "no reportable production as a sales volume" but denying "there was no other production of oil and gas or hydrocarbons."  [Doc. 222, p. 18]  In support they cite three sources.  First, the Gilbreath Defendants cite their responses to Plaintiffs' requests for admissions Nos. 7-9; however, these responses merely restate assertions rather than identifying evidence contrary to Plaintiffs' factual allegations.  [Doc. 184-9, pp. 17-18]

Second, the Gilbreath Defendants cite two of LG's answers from her deposition testimony.  The citations are to the following underlined portions; the Court includes the preceding questions:

> Q.  Would Norman ever encounter a situation where he wasn't able to produce from a given well for an extended period of time?
>
> Mr. Hollington:  Objection, form, compound.
>
> A. [LG]  <u>There were times, I'm sure, that influenced the wells, uh, economy, pipeline pressure.  I do remember him remarking about that at times.</u>

[Doc. 184-8, p. 2, at 49:24-25, 50:1-5 (emphasis added)]

> Q.  Okay. So if there was no production in May of 1990, tell me that—in June of 1990 and in July of 1990, did you or Norman undertake any operations to drill a well during that time period?
>
> Mr. Hollington:  Objection, form, compound.
>
> A. [LG]  <u>To drill?  I have no idea, no.  To work over or work on it, perhaps.  I'm not Norman.</u>

[Doc. 184-8, p. 2, at 51:14-23 (emphasis added)]  These two portions of LG's deposition are conclusory, vague as to time, and admit a lack of information.  As conclusory allegations which

are unsubstantiated and which do not show personal knowledge of the critical facts, they are insufficient to oppose a summary judgment motion. *See Shidler*, 338 F.3d at 1136; Fed. R. Civ. P. 56(c)(4); *Hall v. Belmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). The Gilbreath Defendants' response states that Norman Gilbreath did all of the work on the wells and "had knowledge to respond to questions regarding operations to drill during time periods described in UDFs 8-9," but he died in February 2014. [Doc. 222, pp. 18-19]  LG's deposition testimony fails to identify admissible evidence, based on personal knowledge, specific enough to adequately dispute Plaintiffs' factual allegations.

Third, the Gilbreath Defendants generally cite the LG Affidavit [Doc. 222-2] attached to their response. Plaintiffs argue that the LG Affidavit contradicts LG's deposition testimony and, as a sham affidavit, does not carry the Gilbreath Defendants' burden to identify admissible evidence showing a genuine dispute on a material fact. [Doc. 243, p. 9; Doc. 245, pp. 3-7]

### C.  The Loretta Gilbreath Affidavit

The Gilbreath Defendants rely on Loretta Gilbreath's Affidavit ("LG Affidavit") to show that they "have continuously possessed, occupied, developed, produced gas, and improved the property described in the Calvin lease" since taking assignment of the Lease on March 1, 1985. [Doc. 222, p. 6]  Plaintiffs' reply argues that the Court should exclude the LG Affidavit under the "sham affidavit" rule.  [Doc. 245, pp. 3-7]

The LG Affidavit, executed December 9, 2014, states:

> 4.  After taking assignment of the Calvin Lease in early March of 1985, my husband, Norman L. Gilbreath, now deceased, continuously worked on, developed, operated, improved and produced gas from the Wright Well #1, which well was producing gas on the property described in the Calvin Lease at the time we took assignment of that lease.  My husband continuously worked on, developed, operated and improved the oil and gas property described in the Calvin Lease until he became seriously ill in 2006.

6.  In 2006, Steve Belcher, my son-in-law, took over the duties previously performed by my husband of working on, developing, drilling, operating and producing gas from Wright Well #1 and other activities related to the gas described and produced under the Calvin Lease.  Steve Belcher's activities on behalf of Gilbreath Energy, LLC continued after 2006 through the current date.

7.  During a few limited periods of time, gas was not sold from Wright Well #1 due to several reasons, one reason because of El Paso Natural Gas Company's [EPNG] transmission pipeline pressure problems, which were not within the control of Norman L. Gilbreath.  During those sporadic times, my husband continued to work on, develop and produce gas from Wright Well #1 and when the EPNG transmission line pressure problems were corrected, gas produced from Wright Well #1 flowed into the EPNG transmission lines for sale. Copies of monthly production from Wright Well #1 are attached to this affidavit as Exhibit 2A.

[Doc. 222-2, p. 2]  Exhibit 2A shows production data for the Wright #1 Well from 1994 to 2014.

Some production of gas is shown:  from March 1996 through May 1999; in March 2004; February to March 2006; and November 2006 to January 2014.  There are some gaps within these periods.  But even ignoring the gaps, these records do not show continuous production for any ten-year period of time.  The Gilbreath Defendants rely on the LG Affidavit's conclusory assertions that Norman Gilbreath or Steve Belcher worked on, developed, operated, improved, and produced gas from the Well to fill in these gaps.

In contrast to the allegations in the LG Affidavit, in her earlier deposition Loretta Gilbreath was shown a production summary for the Wright #1 Well and asked about whether production or operations were continuous.  Plaintiffs' reply quotes the following testimony from LG's deposition, showing that LG testified that she had no personal knowledge on these points:

Q.  Okay.  Now, going down for the rest of 1990, for the rest of those months, is there any production listed from the Wright #1 well in these columns?

A.  Going down, no.

Q.  Okay.

A.  There was some production in 1990 apparently.

Q.  And above, in April it looks like, there was some production of gas; is that right?

A.  Also in March.

Q.  Also in March.

A.  Also in February.

Q.  How about May through December?

A.  Looks to be none.

A.  Okay.  So if there was no production in May of 1990, tell me that—in June of 1990 and in July of 1990, did you or Norman undertake any operations to drill a well during that time period?

　　　　Mr. Hollington:  Objection, form, compound.

A.  To drill?  I have no idea, no.  To work over or work on it, perhaps.  I'm not Norman.

Q.  Okay.  You have no personal knowledge of—

A.  No.

Q.  –any such operations.

A.  Well, I know there were times that, like we've discussed before, economy, pipeline condition, El Paso's conditions.  He spoke to me of those kind of things, but I have no knowledge of the time periods.

Q.  Okay.  So, you can't testify today that you or Norman resumed any operations to drill a well in June or July of 1990 after production ceased in May of 1990 regarding the Wright #1 well.

　　　　Mr. Hollington:  Objection, form, compound.

A.  I would not know.

[Doc. 184-8, p. 2, at 51:1-25, 52:1-8]

Q.  Okay.  Do you have personal knowledge of you or Norman resuming any operations to drill a well within 60 days after any of these months in which production—in which there is no production shown?

13

Mr. Hollington:  Objection, form, compound.

A.  No personal knowledge.

[Doc. 184-8, p. 3, at 53:6-11]

Q.  Were you aware of these periods of non-production of the Wright #1 well at the time?

A.  Well, I did do the reporting, so I knew when the months were zero.

[Doc. 184-8, p. 3, at 55:2-5]

Q.  Now, did you produce oil or gas continuously from the Wright #1 well from 2003 to 2013?

A.  We reviewed that earlier.  I don't know.  You've probably got that more in mind than I do.

Q.  Well, we looked at the production history.  Let's look at Exhibit 40.  Go to K 00010, please.

A.  (Witness complies.)

Q.  2003, there was no production from the Wright #1 well reported to the state oil and gas commission, correct?

A.  That's right.

Q.  Okay.  May through December of 2004, on the next page, no production reported to the oil and gas commission; is that correct?

A.  Yes, if you go from May to December, yes.

Q.  And if you go from January through December of 2005, the following year, no production from the Wright #1 well reported to the state oil and gas commission, correct?

A.  That is correct.

Q.  So there wasn't continuous production from the Wright #1 well during 2003 to 2013, was there?

A.  According to this, no.

[Doc. 184-8, pp. 7-8, at 88:11-25, 89:1-8; Doc. 245, pp. 3-5]

Contradictions in a witness's testimony do not, without more, justify preclusion of that testimony. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001).  A subsequent affidavit "'may not be disregarded [merely] because it conflicts with the affiant's prior sworn statements.'"  *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).  But a court may be justified in disregarding a contrary affidavit when the court concludes that it constitutes an attempt to create "'a sham fact issue.'"  *Id.* (quoting *Franks*, 796 F.2d at 1237).  The Tenth Circuit explained:  "To determine whether a contradicting affidavit seeks to create a sham fact issue, we have looked to three factors:  whether:  '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.'"  *Id.* (quoting *Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir. 1995)).  When consideration of these factors leads to the conclusion that the subsequent affidavit constitutes an attempt to create a "sham fact issue," the court does not abuse its discretion in disregarding the affidavit and relying instead on the prior deposition testimony in deciding a summary judgment motion.  *Franks*, 796 F.2d at 1237; *Ralston*, 275 F.3d at 973.

The Tenth Circuit has stated that it is "unusual" for an affidavit to raise a sham issue. *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009).  But if the trial court determines that an affidavit is simply an attempt to create a sham fact issue, the court has discretion to exclude the affidavit in considering a summary judgment motion.  *Id.*  This result is justified by the underlying principle that the utility of summary judgment would be "greatly

undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own testimony." *Franks*, 796 F.2d at 1237.

In *Ralston*, the plaintiff sued the manufacturer of a medical device used to treat her—initially raising four claims but later dropping three. *Ralston*, 275 F.3d at 967-68. In her response to the manufacturer's summary judgment motion, the plaintiff attached an affidavit from her treating surgeon; this affidavit (and a later affidavit) contradicted the surgeon's prior deposition testimony on a number of material facts. *Id*. at 971-73. The Tenth Circuit held that the district court, in rendering summary judgment for the defendant, did not abuse its discretion in disregarding the affidavits and relying on the prior deposition testimony. *Id*. at 973. Consideration of the three relevant factors led to the conclusion that the subsequent affidavits "constituted those kinds of affidavits which fall within the ambit of creating a '*sham fact issue*'": the surgeon had been cross-examined during the deposition; he had access to the pertinent evidence at the time of the deposition; and there was no confused or uncertain testimony in the deposition that required clarification or explanation. *Id*. The Tenth Circuit observed, in addition, that the timing and circumstances supported this conclusion: the affidavits were executed after the plaintiff had narrowed down to one cause of action; the affidavits contradicted parts of the surgeon's prior deposition that were detrimental to the sole remaining cause of action; and the affidavits were executed more than a year and a half after the deposition. *Id*. The Tenth Circuit held that the district court was entitled to disregard the surgeon's affidavits under the sham affidavit rule. *Id*.

As in *Ralston*, the LG Affidavit was executed after the opponents filed for summary judgment, and the Affidavit contradicts detrimental parts of LG's deposition testimony. In *Ralston*, the affidavits at issue were executed by the treating surgeon—a non-party who had no

16

stake in the case.  In the case before the Court, the LG Affidavit was executed by a party to the case, who has a direct stake in the outcome.

Extensively questioned in her deposition about production and operations at the Wright #1 Well, LG agreed that the production summaries showed no production for various time periods.  Asked whether there were operations to drill a well at times no production was shown, LG several times responded that she had "no idea" and "no personal knowledge."  Asked whether there was continuous production from 2003 to 2013, LG testified that she did not know. LG agreed that the production summary did not show continuous production during this time. The LG Affidavit, however, makes conclusory allegations that from March 1985 on, Norman Gilbreath "continuously worked on, developed, operated, improved and produced gas from the Wright Well #1" until 2006 when Steve Belcher, her son-in-law, took over.  The Affidavit alleges that during "a few limited periods of time," gas was not sold for several reasons—mentioning pipeline pressure problems.

The production summary attached to support the LG Affidavit shows the same long gaps, however, as Plaintiffs' exhibit, between 1994 and October 2011.  [Doc. 222-2, pp. 5-12; Doc. 184-6]  The exhibit attached to the LG Affidavit shows production:   from March 1996 through May 1999 (with several gaps of two to three months); in March 2004; in February and March 2006; and from November 2006 through September 2013.  [Doc. 222-2, pp. 6-11]  The summary judgment record presented to this Court appears to show that the portions of the production summary used to question LG in her deposition are the same as the portions attached to the LG Affidavit.  The Gilbreath Defendants make no attempt whatsoever to allege that the production summary attached to the LG Affidavit was not available to LG at the time of her deposition, or that it constituted information only acquired by LG after her deposition.  In addition, that exhibit

17

to the LG Affidavit does not support LG's conclusory allegations of continuous production and operations for any ten-year period, much less from 1985 onward.  The exhibit still shows at best about three years of production, then about seven years with no production except for three scattered months, and then almost eight years of nearly continuous production (up to September 10, 2013).[7]  The Court finds that two periods of production, separated by seven years, could not allow a reasonable jury to find continuous possession of the Subject Minerals, for purposes of the adverse possession claim.

In her deposition, LG admitted she had no personal knowledge of production or operations during the long gaps shown by the production summary, but the LG Affidavit alleges that production and operations were continuous.  Since the production summary attached as an exhibit does not support this allegation and the LG Affidavit identifies no other supporting evidence, the allegation is apparently based on LG's personal knowledge.  The Court therefore finds that the LG Affidavit presents a clear and direct contradiction of LG's prior sworn deposition testimony.

The Tenth Circuit set forth three factors for the Court to consider in deciding whether to exclude an affidavit as a sham.  *Ralston*, 275 F.3d at 973.  First, LG was represented by counsel and could have been cross-examined on the critical points, to clarify or explain her testimony. *See id.*; *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1017 (10th Cir. 2002). Second, there is no suggestion that LG did not have access to the pertinent evidence at the time of her deposition, and there is no suggestion in her later affidavit that it was based on newly discovered evidence. *See Ralston*, 275 F.3d at 973.  In her deposition she testified that she had no personal knowledge on the relevant points; her affidavit does not state that she reviewed any documents or based her

---

[7] The time following Plaintiffs' filing of the original complaint on September 10, 2013, is irrelevant for establishing an adverse possession claim.  [Doc. 1]

later contradictory allegations on any newly acquired information.  Instead, her affidavit appears to be based on an assertion of personal knowledge—an assertion that directly contradicts her earlier deposition testimony.  There is no explanation for the change in testimony.  Third, the deposition testimony does not reflect confusion or uncertainty which the affidavit attempts to explain or clarify.  *See id.*  Instead, LG testified in her deposition several times, clearly and emphatically, that she had no personal knowledge to show continuous production or operations; the LG Affidavit makes no reference to the earlier contrary statements, and makes no attempt to explain the contradiction of the deposition testimony.  *See Franks*, 796 F.2d at 1237.  These circumstances support the conclusion that the LG Affidavit is a sham.  *See id.*; *Boswell v. Jasperson*, 109 Fed. Appx. 270, 274 (10th Cir. 2004) (unpublished) (affirming exclusion of affidavit as sham when plaintiff failed to show affiant lacked access to pertinent evidence at time of deposition, or that affidavit was based on newly discovered evidence, or that affidavit was submitted to clarify an issue).

The deposition was taken on August 12, 2014.  The affidavit was executed on December 9, 2014, to support the response filed two days later.  [Doc. 222 (filed Dec. 11, 2014)]  No explanation is given to show why LG had personal knowledge on December 9th which she disclaimed four months earlier.  In addition, the Court observes that the LG Affidavit was executed to support a critical part of the Gilbreath Defendants' burden in responding to Plaintiff's summary judgment motion.  Suspicious timing supports a conclusion that an affidavit was executed in an attempt to create a fact issue precluding summary judgment.  *See Ralston*, 275 F.3d at 973 (holding no abuse of discretion to disregard later affidavit executed at the time critical to avoid summary judgment); *Franks*, 796 F.2d at 1237 (holding suspicious timing of affidavit supported treating it as sham).

The Court fully recognizes that credibility judgments are not allowed in deciding summary judgment motions, and doubts must be resolved in favor of the Gilbreath Defendants as non-movants.  The Court is not making an improper credibility judgment, but instead is carefully distinguishing between discrepancies which create a sham fact issue and those that merely go to credibility and weight of the evidence.  *See Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1011 n.2 (10th Cir. 1992) (citing with approval *City of Chanute v. Williams Natural Gas Co.*, 743 F. Supp. 1437, 1448 (D. Kan. 1990), *aff'd*, 955 F.2d 641 (10th Cir. 1992), *overruled on other grounds by Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir. 1997)).

Under these circumstances, the Court concludes that it will exclude the LG Affidavit under the sham affidavit rule, finding that the LG Affidavit represents an attempt to create a sham issue of fact.  Such an affidavit is ineffectual to show a genuine issue of material fact and avoid summary judgment.  The Court will therefore disregard the LG Affidavit in deciding Plaintiffs' motion for summary judgment on adverse possession.

### D.  Conclusion on Adverse Possession

Having excluded the LG Affidavit, the Court considers whether the Gilbreath Defendants—who would have the burden of proof at trial on the issue of adverse possession—have identified admissible evidence sufficient to allow a rational jury to find in their favor on the issue of continuous possession of the Subject Minerals.   As discussed above, the first two sources cited by the Gilbreath Defendants do not carry that burden.  The Gilbreath Defendants' responses to Plaintiffs' requests for admissions merely restate assertions rather than identifying admissible evidence contrary to Plaintiffs' factual allegations; the deposition answers from LG identified by the Gilbreath Defendants are conclusory, vague as to time, and admit a lack of information.  The production summary attached to support the LG Affidavit shows at best about

three years of production, then about seven years with no production (except for three scattered months), and then almost eight years of nearly continuous production up to the filing of Plaintiffs' complaint.  Viewing the production summary together with the deposition answers relied on by the Gilbreath Defendants, the Court finds that LG's vague allegations are inadequate to show continuous production or operations during the seven years that the summary shows no production.  The Gilbreath Defendants fail to identify evidence to show continuous possession over a ten-year period.  The Court finds that two periods of production, separated by seven years, could not support a reasonable finding of fact of continuous possession of the Subject Minerals.

Even if the Court did not exclude the LG Affidavit, the Court would still find that the Gilbreath Defendants fail to carry their burden.  The LG Affidavit alleges that Norman Gilbreath "continuously worked on, developed, operated, improved and produced gas from the Wright Well #1," from March 1985 until 2006, and that from 2006 on Steve Belcher "took over the duties previously performed by [Norman Gilbreath] of working on, developing, drilling, operating and producing gas from Wright Well #1."  [Doc. 222-2, p. 2, ¶¶ 4, 6]  These merely conclusory and vague allegations, unsubstantiated by any specific factual basis, are insufficient to withstand a summary judgment motion.  *See Shidler*, 338 F.3d at 1136; Fed. R. Civ. P. 56(c)(4); *Hall*, 935 F.2d at 1111.  Even assuming that some work on the well could show continuous possession of the Subject Minerals, the LG Affidavit would be insufficient because it fails to state a foundation for LG's allegations—stating what work was done, at what specific times, and how she knew of such operations.  *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 855 n.9 (10th Cir. 1999).  The Affidavit does not show that LG had personal knowledge or would be competent to testify to her sweeping allegations.

The Court concludes that the Gilbreath Defendants fail to create a disputed issue of fact on the "continuous" element of their adverse possession claim, and their response is insufficient to oppose the summary judgment motion.  Since a party claiming adverse possession must establish every element, the Court need not consider the other elements of an adverse possession claim.  *See City of Rio Rancho*, 2011-NMSC-037, ¶ 21, 260 P.3d at 421-22; *Hernandez*, 1998-NMCA-064, ¶ 6, 759 P.2d at 1018.  By identifying a lack of evidence on an essential element of the adverse possession claim, Plaintiffs have shown that they are entitled to summary judgment.  *See Adler*, 144 F.3d at 670-71.

The Court will grant Plaintiffs' motion for partial summary judgment on the issue of adverse possession.

II.   ***Plaintiffs' Motion for Partial Summary Judgment—Mineral Ownership and Lease Termination*  [Doc. 180]**

Plaintiffs move for partial summary judgment on the issues of mineral ownership and termination of the Lease.[8]  [Doc. 180]  Responses were filed by:  the Gilbreath Defendants [Doc. 221]; the Energen Defendants [Doc. 230]; and Robert L. Bayless, Producer, LLC, and Animas Energy Group, LLC [Doc. 225].  Plaintiffs filed a combined reply.  [Doc. 243]

Plaintiffs argue that they are entitled to partial summary judgment, holding that Plaintiffs have title to 100% of the Subject Minerals in fee simple, unencumbered by a leasehold interest of Defendants, because the Lease expired automatically for non-production.   The Gilbreath Defendants argue that there are disputed material facts and assert that they engaged in continuous production and operations; alternatively, they argue that some Lease provisions are unenforceable or ambiguous.

---

[8] The Court notes that Count One of the SAC cites the New Mexico Declaratory Judgment Act.  The Court concludes that the federal Declaratory Judgment Act is applicable, as discussed in a separate Memorandum Opinion and Order contemporaneously filed as Doc. 318 (Section I(A)).

Having reviewed the motion, briefs, evidence, and relevant law, the Court concludes that the Lease terminated on July 1, 1990, and ownership of the Subject Minerals reverted to Plaintiff Frank King on that date.

### A. Legal Standards for Oil and Gas Leases

In New Mexico, oil and gas leases are interpreted under the same principles as any other contract. *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844, 852; *Continental Potash, Inc.*, 1993-NMSC-039, ¶ 54, 858 P.2d 66, 80; *see Elliott Indus. Ltd. P'ship v. BP America Prod. Co.*, 407 F.3d 1091, 1112 (10th Cir. 2005). "The primary objective in construing a contract is to ascertain the intention of the parties." *Continental Potash, Inc.*, 1993-NMSC-039, ¶ 54, 858 P.2d at 80 (internal quotation marks omitted). "Oil and gas leases must be construed to give effect to all of their provisions so far as possible." *Owens v. Superior Oil Co*., 1986-NMSC-093, ¶ 9, 730 P.2d 458, 460. "There is an established rule that an oil and gas lease is to be construed most strongly against the lessee." *Greer v. Salmon*, 1971-NMSC-002, ¶ 19, 479 P.2d 294, 299 (noting, however, that this rule should be "cautiously applied").

Whether a contract contains an ambiguity is a question of law. *ConocoPhillips Co.*, 2013-NMSC-009, ¶ 23, 299 P.3d at 852. "A contract term may be ambiguous if it is 'reasonably and fairly susceptible [to] different constructions.'" *Id.* (quoting *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235). "If a court concludes that there is no ambiguity, the words of the contract are to be given their ordinary and usual meaning." *Id.* (internal quotation marks omitted). "When interpreting an unambiguous contract, a court is limited to interpreting the contract which the parties made for themselves [as a court] may not alter or make a new agreement for the parties." *Id.* (internal quotation marks omitted). When the parties have entered into a valid lease of land for oil and gas purposes, and the terms of the lease are "plain

and unmistakable," a court does not have the power to place a different interpretation upon those terms. *Id.* (quoting 2 W.L. Summers, *The Law of Oil and Gas*, § 16:3, at 505 (3d ed. 2006)). If the language employed by the parties is not ambiguous, "it is conclusive." *Continental Potash, Inc.*, 1993-NMSC-039, ¶ 54, 858 P.2d at 80.

The typical habendum clause provides that the lease shall last for a prescribed term of years and "as long thereafter" as oil, gas, or other minerals are produced in paying quantities. 3 Howard R. Williams & Charles J. Meyers, *Oil & Gas Law* § 603 (2014) (hereinafter "Williams & Meyers"). "The modern habendum clause, with its short primary term and its 'thereafter' provision, is designed to measure the duration of the oil and gas lease by its primary objective, the production of oil or gas." *Id.* § 604, at 43. The habendum clause seeks to assure the lessor that there will be production and therefore royalty, while the lessee is assured of a fixed time within which to obtain production and sustain the lease. *Id.* A "vast majority" of courts construe such habendum clauses as "conveying an interest subject to a special limitation rather than as conveying an interest subject to a condition, power of termination or right of re-entry."[9] *Id.* at 43-44. Under the majority view, the habendum clause means that lack of production results in automatic termination of the lessee's interest; this result is supported by the language of the habendum clause and by the intent of the parties and sound policy. *Id.* at 44. In contrast, a fee simple subject to a condition subsequent would not automatically terminate, but would require some action by the lessor. *Id.* at 48.

New Mexico agrees with the "vast majority" of courts. The New Mexico Supreme Court stated: "The typical oil and gas lease grants the lessee a fee simple determinable interest in the subsurface minerals within a designated area." *Maralex Res., Inc. v. Gilbreath*, 2003-NMSC-

---

[9] Only Oklahoma has "clearly rejected the fee simple determinable/automatic termination classification of the habendum clause and has treated the lease as the equivalent of a fee simple subject to a condition subsequent." 3 Williams & Meyers § 604, at 44-45.

023, ¶ 9, 76 P.3d 626, 630. The habendum clause determines the length of the estate. *Id*. The typical habendum clause sets a primary term, during which the lessee must successfully drill a producing well, and provides that the lease will remain in effect as long as oil or gas is produced. *Id*.

Williams & Meyers observes that general antipathy toward construing a contract to result in automatic termination is misplaced in cases involving oil and gas leases. 3 Williams & Meyers § 604, at 48. This form of lease evolved to meet the reasonable requirements of both lessor and lessee. *Id*. § 601.4. The short primary term furthers the lessor's interest in obtaining production, pressuring the lessee to begin drilling within a short period of time; if the lessee fails to do so, the lessor becomes free to arrange for development by another party. *Id*. The lessee does not commit to long-term liability for rentals, being freed from all further obligations after lease termination; at the same time, the lessee is assured that the lease will continue while it is commercially productive. *Id*. This form of lease is also in accord with public policy, because new arrangements for development and production may be made after termination. *Id*. § 604, at 48.

Although the consequences of automatic termination can be "extremely harsh," many leases include saving clauses which provide protection to the lessee "in most situations in which it may be reasonable for [the lessee] to continue to hold the lease despite nonproduction." *Id*. at 49. One such clause is a "cessation of production" clause, typically providing that the lease shall not terminate if the lessee commences production or specified operations within a short period of time after cessation. *Id*. § 615, at 260-61. Another saving clause is a "shut-in royalty" clause for gas leases. *Greer*, 1971-NMSC-002, ¶¶ 9-10, 23, 479 P.2d at 296-97, 299. A mineral lease typically requires the lessee to pay a 1/8 royalty on production; a shut-in royalty clause grants the

lessee a reasonable alternative to continue the lease by paying a set price per annum when the lessee is not able to produce gas. *Id.* ¶ 17, 479 P.2d at 298. Such saving clauses allow the lessee to escape automatic termination; however, failure to satisfy a saving clause still results in the lease expiring automatically. *Id.* ¶¶ 9-10, 23, 479 P.2d at 296-97, 299.

"To satisfy the habendum clause production must be in 'paying quantities,' such that the income generated from oil and gas production exceeds the operating costs." *Id.* (quoting *Clifton v. Koontz*, 325 S.W.2d 684, 690 (Tex. 1959)); *see Clifton v. Koontz*, 325 S.W.2d 684, 690 (Tex. 1959) (considering lease not expressly using term "paying quantities," but holding that it is "well settled" that the terms "produced" and "produced in paying quantities" have substantially same meaning). "Under most leases, if the lessee fails to produce oil or gas <u>in paying quantities</u> before the end of the primary term, or if production ceases after the primary term, the lease will automatically terminate." *Maralex Res., Inc.*, 2003-NMSC-023, ¶ 9, 76 P.3d at 630 (emphasis added). This construction of a mineral lease properly interprets its provisions in accordance with the parties' intent—to obtain production in paying quantities, so that the lessor receives royalties. *Greer*, 1971-NMSC-002, ¶ 7, 479 P.2d at 296.

As assignees of the Lease, the Gilbreath Defendants are subject to the terms of the Lease, including the habendum clause. *See* 3 Williams & Meyers § 604.10 ("Absent a contrary provision in the lease, the habendum clause is unaffected by assignments or partial assignments by the lessor or by the lessee."); *id.* § 656 ("An assignee or partial assignee of a lease becomes liable upon the covenants of the lease including the covenant to pay royalty since such covenants "run with the land" to the assignee." (footnote omitted)).

### B.  Undisputed Facts

Under the habendum clause of the August 4, 1972 Lease, the primary term was three years.  The Lease would continue into a secondary term "as long thereafter as oil or gas or casinghead gas or either or any of them, is produced therefrom; or as much longer thereafter as the lessee in good faith shall conduct drilling operations thereon and should production result from such operations, this lease shall remain in full force and effect as long as oil or gas or casinghead gas, shall be produced therefrom."  [Doc. 182-1]  Under the "cessation of production" clause, the Lease further provides:

> 16.  If within the primary term of this lease production on the leased premises shall cease from any cause, this lease shall not terminate provided operations for the drilling of a well shall be commenced before or on the next ensuing rental paying date; or, provided lessee begins or resumes the payment of rentals in the manner and amount hereinbefore provided.  If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and, if production results therefrom, then as long as production continues.

The Lease requires payment of a 1/8 royalty and includes a "shut-in royalty" clause:

> 2.  The lessee shall pay lessor, as royalty, one-eighth (1/8) of the proceeds from the sale of the gas, as such, for gas from wells where gas only is found, and where not used or sold shall pay Fifty ($50.00) Dollars per annum as royalty from each such well, and while such royalty is so paid such well shall be held to be a producing well.

The Lease also includes a "judicial ascertainment" clause:

> 17.  It is agreed that this lease shall never be forfeited or cancelled for failure to perform in whole or in part any of its implied covenants, conditions, or stipulations until it shall have first been finally judicially determined that such failure exists, and after such final determination, lessee is given a reasonable time therefrom to comply with any such covenants, conditions, or stipulations.

Calvin's interests under the Lease were assigned to Norman and Loretta Gilbreath on March 1, 1985.  [Doc. 182-7; Doc. 182-8, pp. 2-3]   They assigned their interest to their limited

liability company, Gilbreath Energy, LLC, as of December 29, 2006.  [Doc. 182-9]   The

Gilbreaths, and later Gilbreath Energy, LLC, operated the Wright #1 Well from 1985 on.

### C.  Discussion of Disputed Factual Allegations

After the original lessee, Rodney Calvin, drilled the Wright #1 Well, there was

production for some time.  [Doc. 182-11, pp. 1-2]  Plaintiffs allege that production ceased,

however, setting forth the following as undisputed material facts:

> 10.  Production of oil or gas from the Wright #1 Well occurred initially, and then ceased for the periods of May 1990 through February 1991, and April 1991 through February 1996.
>
> 11.  The Gilbreaths did not resume operations to drill a well in June or July of 1990 after production of oil or gas from the Wright #1 Well ceased in May of 1990.
>
> 12.  The Gilbreaths did not resume operations to drill a well within 60 days after production of oil or gas from the Wright #1 Well ceased during the periods April 1991 through December 1991, 1992, 1993, 1994 and 1995.

[Doc. 182, pp. 3-4 (citations to supporting evidence omitted)]   To support these allegations,

Plaintiffs provide:  a Production Summary regarding the Wright #1 Well [Doc. 182-11]; excerpts

from Loretta Gilbreath's 8/12/14 deposition [Doc. 182-8]; and answers from Gilbreath Energy

and Gilbreath Estate to Plaintiffs' requests for admissions [Docs. 182-12, 182-13].

Attempting to dispute Plaintiffs' factual allegations in Paragraphs 10-12 (quoted above),

the Gilbreath Defendants first cite their responses to Requests for Admissions, Nos. 7-9:

> REQUEST FOR ADMISSION NO. 7:  There was no production of oil, gas or hydrocarbons from the Wright #1 Well for the period May 1990 – February 1991.
>
> RESPONSE:  Objection.  Production records of the Wright #1 Well have previously been provided by other Defendants to Plaintiffs.  Plaintiff has also independently secured the production records for this Well.  Further, the production records for the Wright #1 Well are available through the public records of the United States of America and the State of New Mexico.  This Request is duplicative, harassing, burdensome and oppressive to Gilbreath Estate.

28

Without waiving said objection, Gilbreath Estate admits only that there was no reportable production as a sales volume; and denies that there was no other production of oil, gas or hydrocarbons.

REQUEST FOR ADMISSION NO. 8:  There was no production of oil, gas or hydrocarbons from the Wright #1 Well for the period April 1991 – February 1996.

RESPONSE:  [identical response as to No. 7]

REQUEST FOR ADMISSION NO. 9:  There was no production of oil, gas or hydrocarbons from the Wright #1 Well for the period June 1999 – February 2004.

RESPONSE:  [identical response as to No. 7]

[Doc. 182-13, pp. 2-3; Doc. 221, p. 18]  These responses are ineffectual to dispute Plaintiffs' allegations.  The responses fail to identify any admissible contrary evidence, but are at best conclusory assertions without factual support.  *See Adler*, 144 F.3d at 671 (non-movant must identify specific facts); *Shidler*, 338 F.3d at 1136 (conclusory, unsupported allegations are insufficient to oppose summary judgment motion).  The Gilbreath Defendants' responses do, however, admit the relevant point:  there was "no reportable production" for the listed periods of time.  To the extent that the responses deny that there was "no other production," they are irrelevant at any event; what is relevant to the Lease termination is whether there was production "in paying quantities," i.e., reportable production.  According to the New Mexico Supreme Court, production must be in "paying quantities" to satisfy the habendum clause or cessation of production clause.  *Maralex Res., Inc.*, 2003-NMSC-023, ¶ 9, 76 P.3d at 630; *Greer*, 1971-NMSC-002, ¶¶ 8-14, 82 N.M. at 296-97.

Second, while acknowledging LG's admission that she has no personal knowledge regarding any efforts to drill a well during the relevant periods, the Gilbreath Defendants cite two

portions of LG's deposition testimony that she was aware "at times" that due to the economy and pipeline pressure, gas could not flow into the El Paso Natural Gas transmission pipeline for sales. [Doc. 221, p. 18, ¶ 3]   These statements do not directly dispute Plaintiffs' allegations in Paragraphs 10-12.   The two portions cited by the Gilbreath Defendants are emphasized in the quotations below:

> Q.  Would Norman ever encounter a situation where he wasn't able to produce from a given well for an extended period of time?
>
> A.  There were times, I'm sure, that influenced the wells, uh, economy, pipeline pressure.  I do remember him remarking about that at times.

[Doc. 182-8, p. 4, at 49:24-25, 50:3-5 (emphasis added)]

> Q.  Okay.  So if there was no production in May of 1990, tell me that—in June of 1990 and in July of 1990, did you or Norman undertake any operations to drill a well during that time period?
>
> A.  To drill?  I have no idea, no.  To work over or work on it, perhaps.  I'm not Norman.
>
> Q.  Okay.  You have no personal knowledge of—
>
> A.  No.
>
> Q.  –any such operations.
>
> A.  Well, I know there were times that, like we've discussed before, economy, pipeline condition, El Paso's conditions.  He spoke to me of those kind of things, but I have no knowledge of the time periods.
>
> Q.  Okay.  So you can't testify today that you or Norman resumed any operations to drill a well in June or July of 1990 after production ceased in May of 1990 regarding the Wright #1 well.
>
> A.  I would not know.

[Doc. 182-8, p. 4, at 51:14-25, 52:1-8 (emphasis added)]   As conclusory assertions untethered to the relevant time periods, the cited portions of LG's deposition are insufficient to carry the

Gilbreath Defendants' burden to identify admissible evidence to dispute Plaintiffs' factual allegations.

Third, the Gilbreath Defendants cite the LG Affidavit. But the Affidavit contains only conclusory allegations. *See Shidler*, 338 F.3d at 1136; Fed. R. Civ. P. 56(c)(4); *Hall*, 935 F.2d at 1111. The LG Affidavit would be insufficient to oppose the summary judgment motion, even if the Court were not excluding it as a sham affidavit, as discussed above. (*See* Section I(C), above.)

The Court determines that the Gilbreath Defendants fail to identify admissible evidence to dispute Plaintiffs' allegations that: production from the Wright #1 Well ceased in May 1990 and was not resumed until March 1991; and the Gilbreaths did not resume operations to drill a well within sixty days of cessation. The Court deems these facts undisputed for purposes of Plaintiffs' summary judgment motion.[10]

Plaintiffs also set forth the following factual allegation:

13. Plaintiffs received no delay rental, shut-in payment or royalty from the lessee under the Subject Lease.

[Doc. 182, p. 4] To support this allegation, Plaintiffs cite Frank King's affidavit, stating: "No royalty, delay rental or shut-in payments were received from Rodney P. Calvin or Norman and Loretta Gilbreath at any time after we signed the lease." [Doc. 182-5, p. 2, ¶ 4] The Gilbreath Defendants deny this allegation, identifying as evidence their factual allegations in their motion for summary judgment on other issues. [Doc. 195, p. 13, ¶¶ 45-46] Those allegations concern a royalty payment from another Defendant (Energen Resources Corporation) in 2007 for production from the Flora Vista Wells—and do not concern the relevant factual allegation,

---

[10] Similarly, the Court deems undisputed the remaining factual allegations in Plaintiffs' ¶¶ 10-12, quoted above. The same analysis set forth below would lead the Court to conclude that the Lease automatically terminated at later times, if it had not previously terminated on July 1, 1990; however, the Court need not reach the issue regarding subsequent time periods.

whether the Gilbreaths paid Plaintiffs a shut-in royalty in 1990 relating to the Wright #1 Well. Because the Gilbreath Defendants fail to identify admissible evidence to dispute Plaintiffs' allegation, the Court deems it undisputed that the Gilbreaths did not pay a shut-in royalty in 1990 under the Lease concerning the Wright #1 Well.

### D.  Analysis

Two New Mexico cases involving oil and gas leases are particularly relevant.

In *Greer*, the New Mexico Supreme Court considered the interaction of habendum and saving clauses.  Commercial gas production was obtained during the five-year primary term of the lease, but ceased in September 1956 because of a leak in the flow line between the well-head and the meter (except for a small amount in one month).  *Greer*, 1971-NMSC-002, ¶ 4, 479 P.2d at 295.  After the leak was discovered, production resumed.  *Id*.  No gas was sold or used from October 1956 through May 1960, no royalty was paid to the lessors during those years, and no shut-in royalty was paid.  *Id*.  The court held that the lease had automatically terminated.

The lease in *Greer* contained the following habendum clause:

> 'It is agreed that this lease shall remain in force for a term of five years from this date, said term being hereinafter called 'Primary Term,' and as long thereafter as oil and gas, or either of them, is produced or producible by the lessee from any well or wells existing on said land or any Pooled Unit hereunder.'

*Id*. ¶ 5, 479 P.2d at 295.  Except for the unusual inclusion of the term "or producible," the court stated, this was "a typical clause of limitation with a relatively short primary term and its 'thereafter' provision designed for automatic termination."  *Id*. ¶ 8, 479 P.2d at 296.  The lease contained two "saving clauses":   (1) a "cessation of production" clause, providing that if production ceased for any reason after the primary term, the lessee had the right to resume drilling operations within ninety days and that the lease would remain in force as long as such operations were continuously prosecuted and if they resulted in production, as long thereafter as

oil or gas was being produced or producible; and (2) a "shut-in royalty" clause, providing that the lessee could pay $50.00 annually to preserve the lease while gas was not being sold or used.  *Id.* ¶¶ 8-9, 16, 479 P.2d at 296, 298.  These saving clauses "are designed to give the lessee some protection from automatic termination," and are therefore "logically … to be considered in conjunction with the habendum clause and in light of the primary purpose of the lease—the duration of the lessee's interest is to be viewed from the objective of the lease, to obtain paying production." *Id.* ¶ 8, 479 P.2d at 296.  "A lessee cannot be permitted to fail in development and hold the lease for speculative purposes unless in strict compliance with his contract for a valuable and sufficient consideration other than such development." *Id.* (internal quotation marks omitted).

The cessation of production clause allows a grace period so that the lessee can "escape automatic termination of the lease." *Id.* ¶¶ 10-12, 479 P.2d at 297.  *Greer* carefully distinguished covenants from conditions, explaining that the cessation of production clause was a condition affecting the duration of the lease; it was not a covenant because the lessee had a right, but not a duty, to resume drilling operations. *Id.* ¶¶ 10, 20, 479 P.2d at 296-97, 299.

The court explained that the shut-in royalty clause was "a saving clause associated with the habendum clause because its purpose is to grant a reasonable alternative to a lessee who is not able to produce gas," allowing the lessee to preserve the lease. *Id.* ¶ 17, 479 P.2d at 298.  A shut-in royalty is thus a condition. *Id.*  In contrast, the ordinary royalty obligation to pay 1/8 to the lessor is "an express covenant, the non-payment of which does not trigger the automatic termination." *Id.*

Another provision, Paragraph 15, required "notice by the lessor to the lessee of a breach of a duty, and if not cured, then a petition to the court for termination." *Id.* ¶ 18, 479 P.2d at 298.

33

This provision is essentially a "notice and demand" or "judicial ascertainment" clause. *See id*. ¶ 23, 479 P.2d at 299-300 (citing earlier edition of Williams & Meyers).

The lessees in *Greer* argued that the lease could not have automatically terminated, because Paragraph 15 applied to both the cessation of production and shut-in royalty clauses— thus requiring prior notice, opportunity to cure, and then a court petition before termination. Rejecting this argument, the court held: "Paragraph 15 of the lease governs the enforcement of the lessees' covenants and is not applicable to the habendum clause and its associated saving clauses." *Id*. ¶ 23, 479 P.2d at 299-300 (citing earlier version of Williams & Meyers). *Greer* thus carefully distinguishes between provisions which are "associated with the habendum clause" and which are "logically … to be considered in conjunction with the habendum clause," and provisions which govern enforcement of a party's duty.[11] The cessation of production clause did not impose a "duty" on the lessee; the lessee was not required to resume drilling operations after cessation of production, but rather was given the "right" to do so to escape automatic termination. *Id*. ¶ 10, 479 P.2d at 296-97.

In *Greer*, production ceased after the primary term and no drilling operations were conducted within ninety days after cessation. *Id*. ¶ 9, 479 P.2d at 296. The lessees "could have saved themselves from automatic termination by complying with" one of the saving clauses. *Id*. ¶ 23, 479 P.2d at 299-300. Since they did not do so, the lease expired automatically, by its own terms, ninety days after cessation of production. *Id*. No notice and demand, opportunity to cure, or action by the lessor was required prior to termination of the lease.

In a more recent case applying the same principles and approach, the New Mexico Supreme Court again held the lease had automatically terminated. *Maralex Res., Inc. v.*

---

[11] Although *Greer* referred to the former provisions as "conditions" and the latter as "covenants," the important point is not the terminology but the essence of the former as relating to duration of the lease and the latter as duties imposed on a party.

*Gilbreath*, 2003-NMSC-023, 76 P.3d 626.  Norman and Loretta Gilbreath (the same parties as the "Gilbreath Defendants" in this case), were lessees whose well failed to produce from some time in December 1990 to March 1991.[12]  The plaintiff (Maralex) brought suit seeking a declaratory judgment that the Gilbreaths' lease had expired, so that subsequent leases with Maralex as lessee for the same land were valid.  *Id.* ¶ 4, 76 P.3d at 629.  The Gilbreaths argued that there were material questions of fact as to whether they had satisfied the terms of saving clauses.  The New Mexico Supreme Court first concluded that the shut-in royalty clause was inapplicable when a well was incapable of producing gas.  *Id.* ¶ 26, 76 P.3d at 634.  The Gilbreaths argued that they had satisfied the terms of a clause similar in effect to a "cessation of production" clause; the court did not reach this unpreserved issue.  *Id.* ¶¶ 27-30, 76 P.3d at 635-36.  The Gilbreaths also argued that the force majeure clause prevented termination of the lease, asserting that production ceased because of a problem beyond their control with the pipeline pressure.  The court concluded that this claim was equivalent to an affirmative defense, so that the Gilbreaths had the burden to come forward with evidence showing that the cessation of production was beyond their control; since the Gilbreaths did not identify evidence supporting their claim under the force majeure clause, the court affirmed the trial court's grant of summary judgment to Maralex.  *Id.* ¶¶ 31-34, 76 P.3d at 636-37.  The New Mexico Supreme Court held that the lease automatically terminated when production ceased in the spring of 1991, because no saving clause applied.  *Id.* ¶ 36, 76 P.3d at 637.

In the case before this Court, the habendum clause of the Lease is similar to those in *Greer* and *Maralex*—providing that the Lease would continue for a primary term of three years and "as long thereafter as oil or gas or casinghead gas or either or any of them" was produced.

---

[12] The case also involved another lease which expired when the Gilbreaths did not build a new well within three years.  *Maralex Res., Inc.*, 2003-NMSC-023, ¶ 4, 76 P.3d at 629.

Under the undisputed facts, production ceased in May 1990 and was not resumed until March 1991, and the Gilbreaths did not resume operations to drill a well within sixty days of cessation. The Lease was then in its secondary term.   Under Paragraph 16, once production ceased, the Lease would not have terminated if the Gilbreaths "resume[d] operations for drilling a well within sixty (60) days from such cessation."   Since they did not do so, Paragraph 16 did not apply to prevent automatic termination of the Lease.

As discussed above, the Court determined that the Gilbreath Defendants failed to identify admissible evidence to dispute Plaintiffs' factual allegations that production ceased in May 1990 and the Gilbreaths did not meet the requirements of the saving clause, Paragraph 16.   In addition, although LG testified in her deposition that "perhaps" Norman had "work[ed] over or work[ed] on" the well, such activity would not meet the requirement of Paragraph 16.   [Doc. 182-8, p. 4, at 51:19-20]   Some cessation of production clauses provide for preservation of a lease if the lessee commences "drilling or reworking operations."   *See* 3 Williams & Meyers §§ 615, 615.4. Paragraph 16, however, is more limited—requiring commencement of "operations for drilling a well" and providing that the Lease shall remain in force "during the prosecution of such operations and, if production results therefrom, then as long as production continues."   [Doc. 182-1 (emphasis added)]   This clause requires operations to drill "a" well (implying a new well), and preserving the Lease only if, and for long as, production is obtained from that well ("therefrom").[13]   *See* 3 Williams & Meyers § 615.4, pp. 274-75; *see also Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 556 (Tex. 2002).   Similarly, even if the Court were not excluding the LG Affidavit, the type of operations to which LG conclusorily referred would not

---

[13] The Gilbreath Defendants' response fails to accurately quote the emphasized language in Paragraph 16—replacing "a well" with "the well," and omitting "therefrom."   [Doc. 221, p. 11]

meet the requirement of Paragraph 16.  [Doc. 222-2, p. 2, ¶ 4 (alleging that Norman Gilbreath "continuously worked on, developed, operated, [and] improved" the Wright #1 Well)]

The Gilbreath Defendants do not identify any evidence showing that they commenced operations for drilling a well within sixty days and that such well resulted in production.  This failure to satisfy the saving clause of Paragraph 16 resulted in automatic termination of the Lease—as the New Mexico Supreme Court held in *Greer*, involving a similar "cessation of production" clause.  *Greer*, 1971-NMSC-002, ¶¶ 9-10, 479 P.2d at 296-97.

Alternatively, the Gilbreaths could have preserved the Lease under the shut-in royalty clause by paying $50.00 per annum to Plaintiffs.  If these payments were made, the well would have been held to be a producing well, which would have prevented automatic termination.  *See Maralex Res., Inc.*, 2003-NMSC-023, ¶ 11-26, 76 P.3d at 630-35; *Greer*, 1971-NMSC-002, ¶¶ 18-23, 479 P.2d at 298-300.  Under the undisputed facts found by the Court, the Gilbreaths did not pay Plaintiffs a shut-in royalty in time to preserve the Lease.  Since they did not do so, Paragraph 2 did not apply to prevent automatic termination.

As in *Greer* and *Maralex*, the Lease provides for automatic termination.  As in *Greer* and *Maralex*, the Gilbreaths could have preserved the Lease by complying with the requirements of either of the two saving clauses:  Paragraph 16 (cessation of production), or Paragraph 2 (shut-in royalty).  Since they failed to do so, the Lease automatically terminated sixty days after cessation of production.  Since there was no production after April 1990, the Lease automatically terminated on July 1, 1990.

### E.  Defendants' arguments

The Energen Defendants' response states that they take no position on ownership of the Subject Minerals or termination of the Lease, but notes that termination of the Lease may raise

an issue about Plaintiffs' gas being "underproduced" and equitable gas balancing procedures. [Doc. 230]  The Court concludes that no issues in this response are before the Court for decision at this time.

 Bayless and Animas filed a response raising three arguments.  [Doc. 225]  First, they argue that the force majeure and judicial ascertainment clauses prevented the Lease from terminating; these issues are addressed below.  (*See* Section II(E)(2)-(3).)  Second, they argue that there are factual issues of laches, estoppel, and waiver; they rely on the Energen Defendants' summary judgment motion [Doc. 81] for these arguments (which is addressed in a separate Memorandum Opinion and Order contemporaneously filed as Doc. 315).  Third, Bayless and Animas argue that:  Plaintiff Paula Elmore had no interest in the Subject Minerals until the December 28, 2006 assignment by Plaintiff Frank King; Plaintiff Paula Elmore was married to another person at that time; and there is a fact issue whether her interest in the Subject Minerals is community property.  The Court will not reach this fact issue at this time; the Court will conclude that the Lease automatically terminated on July 1, 1990, and ownership of the Subject Minerals reverted to Plaintiff Frank King on that date.

The Gilbreath Defendants raise a number of arguments against Plaintiffs' motion on the issue of Lease termination.  None of these arguments is persuasive.

**(1) Wording of Lease**

The Gilbreath Defendants argue that the term "automatic termination" does not appear in the Lease.  [Doc. 221, pp. 11, 14]  But these words did not appear in the leases at issue in *Maralex* and *Greer*, either; yet the New Mexico Supreme Court in each case interpreted similar provisions in each lease to provide for automatic termination.  *Maralex Res., Inc.*, 2003-NMSC-023, ¶¶ 9, 36, 76 P.3d at 630, 637; *Greer*,  1971-NMSC-002, ¶¶ 8-11, 23, 479 P.2d at 296-97,

299.  As noted above, this is also the conclusion of the "vast majority" of courts interpreting such habendum clauses.  3 Williams & Meyers § 604, at 43-44.  The words used in the Lease show the parties' intention to convey a fee simple determinable interest, automatically terminating upon cessation of production if no saving clauses apply.

### (2)  "Judicial ascertainment" clause

The Gilbreath Defendants argue that Paragraph 17 precludes automatic termination of the Lease.  They argue that Paragraph 17 requires a lawsuit and court decision that there has been a failure to perform the conditions of the habendum and cessation of production clauses, and that after that they are entitled to a reasonable time to comply.  [Doc. 221, pp. 13-15]  Paragraph 17 provides:

> 17.  It is agreed that this lease shall never be forfeited or cancelled for failure to perform in whole or in part any of its implied covenants, conditions, or stipulations until it shall have first been finally judicially determined that such failure exists, and after such final determination, lessee is given a reasonable time therefrom to comply with any such covenants, conditions, or stipulations.

[Doc. 182-1]  The Gilbreath Defendants argue that Paragraph 17 applies to every part of the Lease, including its duration, and that it means there can be no automatic termination under the habendum clause.[14]

Plaintiffs argue that Paragraph 17 does not affect automatic termination under the habendum clause or cessation of production clause.  [Doc. 182, pp. 15-16; Doc. 243, p. 10] Plaintiffs cite a West Virginia case which relied on the New Mexico case of *Greer*.  *McCullough Oil, Inc. v. Rezek*, 346 S.E.2d 788 (W. Va. 1986).  Plaintiffs argue that accepting the Gilbreath

---

[14]The Gilbreath Defendants rely in part on the deposition by Plaintiffs' witness, Phillip Brewer, in which Brewer stated that a plain reading of Paragraph 17 might cause one to interpret the Lease to require a judicial determination before termination, forfeiture, or cancellation.  [Doc. 221-2, p. 2, at 63:14-21]  The Court has ruled, in a separate Memorandum Opinion and Order filed as Doc. 313, to exclude Brewer's report and testimony.  Even if the Court were not excluding Brewer's testimony, construction of the Lease is a question of law for this Court—not a matter for expert testimony.

Defendants' argument would mean that no lease containing a judicial ascertainment clause could automatically terminate for nonproduction; the lessor would always have to bring suit, and mineral rights would be clouded.

*McCullough* held that the habendum clause conveyed a determinable interest which automatically terminated if there was no production or operation in the primary term, and automatically terminated thereafter if actions required by the cessation of production clause were not taken within the "grace period" provided.  *Id*. at 794-95.  The lessor need not take any affirmative action for the lease to terminate; these terms are "self-executing" and do not result in a forfeiture.[15]  *Id*.  Distinguishing between the conveyance and contractual provisions of a mineral lease, the court characterized the purpose of a "notice and demand" clause as avoiding an inadvertent breach of contract and an unexpected cancellation or forfeiture for breach of the lessee's duties.  *Id*. at 795.  The West Virginia court held that the notice and demand clause "has no effect upon the habendum clause or cessation of production clause," but only "relates to express and implied contractual obligations (covenants)."  *Id*. at 795-96.  Otherwise, the notice and demand clause would "convert a determinable interest under the habendum clause or cessation of production clause into an interest subject to a condition subsequent."  *Id*. at 796. *McCullough* concluded that the lessee is not entitled to notice before automatic termination, observing that "once the lease automatically terminates, requiring notification of the lessee would be a superfluous act, for the lessee could not unilaterally revive the lease."  *Id*. *McCullough* cited *Greer*, along with numerous other cases, for this conclusion.  The West Virginia court reasoned that it would be inconsistent to require notice and demand by the lessor, when the lease was intended to allow automatic termination without any affirmative action by

---

[15] The court noted that the distinction is important:  since there is no forfeiture under such a lease, the rule that equity abhors a forfeiture is not applicable.  346 S.E.2d at 795.

the lessor.  The court concluded that its construction furthered the primary purpose of the lease, limiting the duration of the lessee's interest to the continued use of his interest for the purpose for which that interest was created:  obtaining production.  *Id*. at 797.  The limitation on the lessee's interest is in accord with public policy, normally allowing the parties to be certain whether the lease has terminated and allowing the lessor to make new arrangements for production if the lessee is no longer producing.  *Id*.  *McCullough* concluded that the lease expired by its own terms upon the lessee's failure to comply with the cessation of operations clause, that the lessee was not entitled to notice that he had ceased production, and that no "default or forfeiture" resulted.  *Id*. The critical points in *McCullough* are the distinction between a lessee's duties and rights, and the determination that a notice and demand clause applies only to the former, and does not preclude automatic termination.

The Court finds the analysis and reasoning of *McCullough* persuasive and in accord with New Mexico caselaw.  Although Paragraph 17 refers to "implied covenants, conditions, or stipulations," the critical principle is that a judicial ascertainment clause, like a notice and demand clause, applies to duties (for example, the duty to pay royalties) and does not negate the automatic termination provisions of the Lease.

The Court also finds persuasive the analysis and reasoning of the authoritative treatise, Williams & Meyers—cited with approval in New Mexico caselaw.  A "judicial ascertainment" clause performs a similar function to a "notice and demand" clause.  Williams & Meyers treats the two related types of clauses together, explaining that the former provides further protection to the lessee when it might not be clear whether the lessee is required to comply with a notice and demand.  4 Williams & Meyers § 682.  The treatise explains that the judicial ascertainment clause, like the notice and demand clause, gives the lessee a second chance to satisfy its

obligations under the lease.  Careful consideration of the caselaw and principles involved lead the Court to conclude that the same distinction between duties and rights made by *Greer* is determinative; a notice and demand or a judicial ascertainment clause is applicable to duties which the lessor can require the lessee to perform.  But the Lease does not require the Gilbreaths to perform continued drilling or operations, instead allowing them the right but not the duty to do so; they are free under the Lease to discontinue drilling or operations and allow the Lease to expire.

Williams & Meyers includes a number of "notice and demand" and "judicial ascertainment" clauses, some of which also refer to "conditions" in addition to "covenants" or "stipulations"; the treatise observes that most of these clauses "are broadly phrased so as to be applicable to a great variety of covenants and conditions."  *Id*. § 682.1.  The treatise nevertheless concludes that such clauses do not affect the operation of the habendum clause and saving clauses—citing *Greer* as one of many cases taking this approach.  *Id*. § 682.2.  If Paragraph 17 were intended to negate the normal interpretation of the habendum clause, the parties could have used clearer language; the Court will not presume that they intended to change a fundamental aspect of the Lease without a more clearly expressed intention.  *See id*. § 682.2 ("It has long been understood that a leasehold created by an unless lease terminates automatically without any requirement of notice or judicial ascertainment in the event of failure of production ….  Under such circumstances it is unreasonable to conclude that the parties, by including in the lease a vaguely phrased notice and demand or judicial ascertainment clause, intended to modify the operation of these limitation clauses.")  Instead, the Court presumes that the parties intended the Lease to provide for automatic termination, in accordance with the clear language of limitation in the habendum clause.  *See id*. § 682.2 ("In view of the clear language of limitation in the

habendum clause and the delay rental clause of the typical lease, a notice and demand or judicial ascertainment clause referring generally to 'forfeiture,' 'default,' 'obligations,' 'breach,' or using similar language, should not be construed as modifying the limitation provisions of the lease."). Despite inclusion of the term "conditions" in Paragraph 17, the Court concludes that when the Lease is viewed as a whole, giving effect to all of its parts, the parties intended to give the lessee a fee simple determinable interest and to require judicial ascertainment only for failure to perform duties under the Lease.

Interpreted as the Gilbreath Defendants argue, Paragraph 17 would undermine the principle of automatic termination. Williams & Meyers states that "notice and demand" and "judicial ascertainment" clauses are simply inapplicable when the theory is that the lease has expired under its own terms. 4 Williams & Meyers § 682. The treatise states that such clauses do not affect the operation of the limitation provisions, and do not convert a lease providing for automatic termination into one subject to a condition subsequent. *Id*. § 682.2.

The Gilbreath Defendants further argue that the Court should avoid an interpretation allowing a forfeiture, because equity dislikes a forfeiture. Paragraph 17 specifically states that the Lease "shall never be forfeited or cancelled." Cancellation of a lease for breach of a covenant or duty seeks a forfeiture, and the Court concludes that Paragraph 17 would require judicial ascertainment in this situation; the lessee would then be given an opportunity to cure the breach of a covenant or duty. In contrast, no "forfeiture" or "cancellation" is involved when a lease automatically terminates. *Id*. §§ 604, 682, 658.3 n.1 (emphasizing distinction between "true forfeiture" and automatic termination); 2 Summers, *Oil & Gas* § 15:2 (3d ed. 2015) (distinguishing automatic termination from forfeiture). To allow a lessee to unilaterally revive a lease by resuming production after automatic termination would be wholly inconsistent with the

principle of automatic termination, under which the minerals revert to the lessor without any action being required by the lessor. The Court concludes that Paragraph 17 of the Lease is inapplicable under the circumstances of this case.

The Court believes that *Greer* supports this analysis. Carefully distinguishing between conditions and covenants, the *Greer* Court held that a judicial ascertainment clause applied only to breach of a duty, or covenant—not to a condition determining duration of the lease. *Greer*, 479 P.2d at 298-300. The Gilbreath Defendants argue that Plaintiffs' reliance on *Greer* is misplaced, because *Greer* does not involve a provision similar to Paragraph 17. The Court disagrees. *Greer* states that the clause at issue there (Paragraph 15) required "notice by the lessor to the lessee of a breach of a duty, and if not cured, then a petition to the court for termination." *Greer*, 479 P.2d at 298. The Gilbreath Defendants also assert that *Greer* does not describe or define Paragraph 15; although *Greer* does not quote Paragraph 15, the description given is sufficient to show that it is similar to Paragraph 17 of the King/Gilbreath Lease. To support its holding that Paragraph 15 did not apply to the habendum clause and saving clauses, the New Mexico Supreme Court cited § 682.2 of a prior version of Williams & Meyers. 1971-NMSC-002, ¶ 23, 479 P.2d at 299-300. Section 682.2 of the current version of this treatise states that notice and demand and judicial ascertainment clauses are inapplicable to the limitation provision of a habendum clause providing for automatic termination. 4 Williams & Meyers § 682.2.

This interpretation of the Lease is consistent with the parties' intention to limit its duration to a relatively short period of time unless the lessee continued to fulfill the purpose of the Lease: obtaining production in paying quantities, so that both lessor and lessee received a benefit. The Gilbreath Defendants' argument would contravene this fundamental intention, requiring Plaintiffs to successfully prosecute a lawsuit and then allow a reasonable time for the

Case 1:13-cv-00862-JCH-LAM   Document 314   Filed 03/30/16   Page 45 of 50

Gilbreath Defendants to comply.  When production ceased in May 1990, the Lease required production or drilling operations to be resumed within sixty days.  Accepting the Gilbreath Defendants' interpretation would mean that they were allowed to tie up Plaintiffs' mineral rights for far longer than sixty days without carrying out the purpose of the Lease:  production, with royalties to Plaintiffs.  This interpretation would contravene Plaintiffs' purpose in executing a Lease with automatic termination provisions.

The Court concludes that Paragraph 17 in the King/Gilbreath Lease is inapplicable to the habendum and saving clauses.  The Lease automatically terminated by July 1, 1990, without any action required by Plaintiffs or any court.

### (3)  Force majeure clause and pipeline pressure

As Plaintiffs observe, there are suggestions in Loretta Gilbreath's deposition testimony and in the LG Affidavit that nonproduction was the result of problems with El Paso Natural Gas Company's pipeline pressure, problems beyond the control of the Gilbreath Defendants.  [Doc. 184-8, p. 2, at 49:24-25, 50:1-5; Doc. 222-2, p. 2]  The Gilbreath Defendants do not, however, articulate an argument under Paragraph 18 of the Lease, the force majeure clause precluding liability or termination for failure to comply with the Lease because of governmental action or other matters beyond the lessee's control.  The Court agrees that no such argument could be made here, when there were only conclusory allegations rather than identification of evidence relating to specific, relevant time periods.  As the New Mexico Supreme Court held, an argument under a force majeure clause "is equivalent to an affirmative defense, and therefore the burden is on the lessee to prove that the events were beyond their control."  *Maralex Res.*, 2003-NMSC-023, ¶ 34, 76 P.3d at 636-37.  The *Maralex* court rejected the Gilbreaths' force majeure claim, holding that they failed to carry their burden to present evidence to establish that the cessation of

production in that case was caused by problems with the El Paso pipeline.  As in *Maralex*, the Gilbreath Defendants did not carry their burden to make a claim under the force majeure clause in the case before this Court.

Animas and Bayless argue in their response that the force majeure clause prevented the Lease from terminating.  [Doc. 225, pp. 2-3]  They set forth a factual allegation that, in the early 1990s, gas oversupply, high pressure in transmission and gathering lines, and a shortage of compression may have prevented termination of the Lease under the force majeure clause.  [Doc. 225, p. 2, ¶ 3]  For factual support, they identify a portion of Phil Brewer's deposition testimony; when asked whether these conditions "<u>would</u> prevent termination" of the Lease, Brewer responded:  "<u>If</u> it initiated the force majeure provisions of the lease, that <u>might</u> be so, yes, sir, <u>on that assumption</u>."  [Doc. 225-1 pp. 7-8 (emphasis added)]  This testimony is too irresolute to support a force majeure claim.  More important, Brewer's testimony is not specifically directed to the relevant time period; the question is whether the Gilbreath Defendants were prevented from producing in May to June of 1990, while Brewer's testimony is directed generally to "the early 1990s."

### (4)  Mutual assent to contract

The Gilbreath Defendants argue that there is a question of fact regarding whether there was mutual assent to the habendum paragraph and Paragraph 16 of the Lease, because Calvin did not sign the Lease.  Plaintiffs argue that the Gilbreath Defendants inconsistently claim the benefit of the Lease while arguing it is invalid and its terms are not binding on them.  For instance, in their adverse possession claim, the Gilbreath Defendants rely on the Lease to meet the requirement that they show color of title.

A "typical oil and gas lease grants the lessee a fee simple determinable interest in the subsurface minerals." *Maralex Res.*, 2003-NMSC-023, ¶ 9, 76 P.3d at 630.   A grant or reservation of oil or gas rights constitutes a grant or reservation of real property—not personal property. *See Ideal v. Burlington Res. Oil & Gas Co. LP*, 2010-NMSC-022, ¶ 22, 233 P.3d 362, 369-70; *Terry v. Humphreys*, 1922-NMSC-013, ¶ 21, 203 P. 539, 543; 1 Williams & Meyers § 214.   A deed conveying a mineral interest must be executed in accordance with the law governing conveyance of land in the state.   3A Summers, *Oil & Gas*, § 35:7 (3d ed. 2015); 2 Summers, *Oil & Gas* § 12:3.   Effective legal delivery of a warranty deed requires intent to make a present transfer and a transfer of dominion and control.   *Blancett v. Blancett*, 2004-NMSC-038, ¶ 7, 102 P.3d 640, 642.   A grantee's possession of a validly executed deed ordinarily raises a presumption of legal delivery.   *Id.* ¶¶ 8, 13, 102 P.3d at 642, 644.   A deed must be signed by the grantor.   *See* NMSA 1978, § 47-1-5 (1851).   A warranty deed following the form included in the New Mexico statutes is effective; the model form does not require the signature of the grantee. *See* NMSA 1978, § 47-1-29 (1947); NMSA 1978, § 47-1-44 (1947); *see also* 3 Williams & Meyers § 656 (stating that lessee who accepts lease becomes liable on covenants even though lessee may not have signed lease).   Calvin's signature was not required to make the Lease valid. Calvin assigned the Lease to Norman and Loretta Gilbreath.   [Doc. 182-7]   As assignees of Calvin, the Gilbreath Defendants are bound by the same terms that bound Calvin.

### (5) Statute of frauds

The Gilbreath Defendants argue that the Lease, though in writing, does not satisfy the statute of frauds because it is not signed by the party against whom it would be enforced.   In this case, Plaintiffs are actually the parties against whom the Lease would be enforced; it was Plaintiffs who conveyed an interest in the Subject Minerals.   *See Viramontes v. Fox*, 1959-

NMSC-020, ¶ 12, 335 P.2d 1071, 1074 (stating that purpose of statute of frauds is to enable court to determine whether contract was made as alleged and that question of signature is "wholly subsidiary to that issue").  [Doc. 221, p. 8 (Gilbreath Defendants' response citing *Viramontes)*] The Gilbreath Defendants take inconsistent positions; if the Lease were not valid, Plaintiffs would not have needed to bring suit to declare the Lease had terminated.  And at any event, part performance by Calvin and the Gilbreath Defendants would limit application of the statute of frauds and remove the Lease from operation of the statute of frauds.  *See Beaver v. Brumlow*, 2010-NMCA-033, ¶¶ 17-18, 231 P.3d 628, 632.

### (6)  Division order

The Gilbreath Defendants argue that the 1973 Division Order amended the Lease to preclude automatic termination.  [Doc. 221-1]  The Division Order provides:

> Each such lease shall, unless sooner terminated in writing in whole or in part by you, continue in full force and effect for each calendar year during any part of which a well located thereon is capable of producing oil or gas, or for any calendar year during any part of which you are engaged in drilling or reworking operations to make the lease capable of such production.

[Doc. 221-1, p. 1]  The Gilbreath Defendants argue that they "continuously operated Wright Well #1 from 1985," and that "[o]perations, drilling, and reworking of the wells continued within 60 days of the few periods when there were pressure problems with El Paso Natural Gas pipelines."  [Doc. 221, p. 12 & n.8 (citing the LG Affidavit)]  Assuming arguendo that the Division Order amended the Lease, this argument fails because the only evidence identified in support of the factual allegations of continuous operations is the LG Affidavit, which the Court has excluded as a sham affidavit.   The Court therefore need not address this argument further.

But, at any event, "the weight of authority clearly establishes that the division or transfer order does not amount to a conveyance of any interest in the land, minerals or royalty."  *In re*

*Unioil, Inc.*, 962 F.2d 988, 995 (10th Cir. 1992)) (quoting Howard R. Williams, *Oil & Gas Law* § 707 (1991)); *see Quinlan v. Koch Oil Co.*, 25 F.3d 936, 940 (10th Cir. 1994) (stating that transfer orders do not convey an interest); 4 Williams & Meyers § 701 ("In brief, a division order is simply a direction and an authorization to a person who has (or will have) a fund for distribution among persons entitled thereto as to the manner of distribution.").  A division order authorizes a purchaser to receive oil or gas and allocates the interest of each party to be credited; even if the order inaccurately reports the interests of the parties, the division order is merely a direction for payment which does not alter the interests of each party in the minerals or land.  *In re Unioil, Inc.*, 962 F.2d at 995 (quoting with approval 4 Howard R. Williams, *Oil & Gas Law* §§ 704.5, 707 (1991)).[16]  In this opinion, the Tenth Circuit agreed with and approved these "well established principles" from the treatise.  *Id*. (approving the treatise as the general rule, even though there was no Colorado precedent).  *In re Unioil* is a 1992 opinion, quoting and approving an earlier version of the treatise, but the current version of the treatise includes virtually identical statements to those approved by the Tenth Circuit.  4 Williams & Meyers §§ 704.1, 704.5, 707 (2014).

    The case cited by the Gilbreath Defendants does not support their argument that the division order "is an amendment to the Calvin lease."  [Doc. 221, p. 12 (citing *Murdock v. Pure-Lively Energy 1981-A, Ltd.*, 1989-NMSC-048, 775 P.2d 1292)]  Instead, the description of division orders in *Murdock* is consistent with the principles approved by the Tenth Circuit in *In re Unioil*, as set forth in the Meyers treatise.  *Murdock*, 1989-NMSC-048, ¶ 14, 775 P.2d at 1296 (stating that a division order is a specialized contract providing authorization to an oil or gas purchaser to pay proceeds from production to the owners of production, with the function of

---

[16] New Mexico statute defines a division order as "a contract of sale to the purchaser of oil and gas." NMSA 1978, § 70-7-16A (1975).

protecting purchaser as distributor of funds against liability for improper payment).  If it were necessary to reach the issue, the Court would conclude that the division order did not, and was not intended to, amend the Lease.

### F.  Conclusion on Mineral Ownership and Lease Termination

Plaintiffs argue that they are entitled to partial summary judgment, holding that Plaintiffs have title to 100% of the Subject Minerals.  Bayless and Animas raised the issue of whether Plaintiff Paula Elmore's husband at the time of the December 28, 2006 assignment has an interest in the Subject Minerals as community property.  The Court will not reach this issue at this time, but concludes that it is sufficient for purposes of Plaintiffs' summary judgment motion to conclude that:  the Lease automatically terminated on July 1, 1990; and ownership of the Subject Minerals reverted to Plaintiff Frank King on that date.

**IT IS THEREFORE ORDERED THAT:**

(1)   *Plaintiffs' Motion for Partial Summary Judgment—Adverse Possession* [Doc. 183] is **GRANTED**; and

(2)   *Plaintiffs' Motion for Partial Summary Judgment—Mineral Ownership and Lease Termination* [Doc. 180] is **GRANTED in part** and **DENIED in part**, as discussed above.

_____

**UNITED STATES DISTRICT JUDGE**