IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FRANK A. KING and PAULA S. ELMORE
f/k/a PAULA S. KING,

        Plaintiffs,

    vs.                                     Civ. No. 13-862  JCH/LAM

ESTATE OF NORMAN L. GILBREATH,
DECEASED, LORETTA E. GILBREATH,
GILBREATH ENERGY, LLC, ENERGEN
RESOURCES CORPORATION, ROBERT L.
BAYLESS, PRODUCER LLC, ANIMAS
ENERGY GROUP, LLC, JAMES M. MARTIN,
SAN JUAN BASIN PROPERTIES, LLC a/k/a
SAN JUAN BASIN OPERATING a/k/a
SAN JUAN BASIN RESOURCES, TOP
OPERATING COMPANY, MARALEX
RESOURCES, INC., JOHN DOES I-X, AND
ALL UNKNOWN PERSONS WHO MAY
CLAIM A LIEN, INTEREST OR TITLE
ADVERSE TO PLAINTIFFS,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the following motions:  *Energen Defendants' Motion for Summary Judgment No. 1:  Statute of Limitations and Laches* [Doc. 81]; and *Defendants Gilbreaths' Motion for Summary Judgment* [Doc. 193].

In this Memorandum Opinion and Order, the "Gilbreath Defendants" refers to:  Loretta E. Gilbreath, Personal Representative of the Estate of Norman L. Gilbreath, Deceased; Loretta E. Gilbreath; and Gilbreath Energy, LLC.[1]   The "Energen Defendants" refers to:   Energen

---

[1] Although some references herein are to time periods before Gilbreath Energy was created, and therefore refer to Norman and Loretta Gilbreath alone, when that distinction is not relevant the Court refers generally to the "Gilbreath Defendants."

Resources Corporation ("ERC"); James M. Martin; San Juan Basin Properties, LLC a/k/a San

Juan Basin Operating a/k/a San Juan Basin Resources; TOP Operating Company; and Maralex

Resources, Inc.  "Bayless and Animas" refers to:  Robert L. Bayless, Producer LLC, and Animas

Energy Group LLC.

## FACTUAL BACKGROUND[2]

Plaintiffs filed suit seeking a determination that the Oil and Gas Lease ("Lease") they

executed to Rodney P. Calvin, which was later assigned to Defendants Loretta and Norman

Gilbreath, terminated.[3]  Plaintiffs seek damages for revenues owed from wells attributable to

Plaintiffs' mineral interest.

Pursuant to a March 2, 1973 "Mineral Deed" from A.L. and Reba Duff, Plaintiff Frank

King acquired the minerals underlying the following lands in San Juan County, New Mexico:

> Township 30 North, Range 11 West, NMPM
> Section 19:  W/2NW/4SE/4, except 1.63 acres, more or less
> Containing 18.37 acres, more or less

[Doc. 184-2]  Before this deed was executed, Plaintiffs[4] had entered into the Oil and Gas Lease

dated August 4, 1972 ("Lease"), conveying an interest in part of these minerals to Rodney P.

Calvin.  [Doc. 184-1]  The Lease conveyed an interest in the minerals "from the surface of the

earth to the base of the Pictured Cliffs Formation only"—referred to herein as the "Subject

Minerals."  [Doc. 182-1, p. 1, ¶ 21]  The lessee agreed to pay a royalty of 1/8.

The primary term of the Lease was three years; the Lease would continue "as long

thereafter as oil or gas or casinghead gas or either or any of them, is produced therefrom; or as

---

[2] The following summary sets forth a general statement of facts.  When additional facts are relevant to a particular motion, the Court views the facts in the light most favorable to the nonmovant on that particular motion.

[3]  A full statement of the procedural background is contained in the Memorandum Opinion and Order contemporaneously filed as Doc. 314.

[4] Plaintiffs had been married but were divorced in 1971; however, they signed the Lease in 1972 as "Frank A. King" and "Paula S. King," husband and wife.  [Doc. 95, p. 2; Doc. 182-3]  Frank King was divorced when the 1973 deed was executed.  On December 28, 2006, Frank King conveyed a 50% interest in the minerals (including the Subject Minerals) to his then ex-wife, Paula S. Elmore.  [Doc. 182-14]

much longer thereafter as the lessee in good faith shall conduct drilling operations thereon and should production result from such operations, this lease shall remain in full force and effect as long as oil or gas or casinghead gas, shall be produced therefrom."  The Lease further provides:

> 16.  If within the primary term of this lease production on the leased premises shall cease from any cause, this lease shall not terminate provided operations for the drilling of a well shall be commenced before or on the next ensuing rental paying date; or, provided lessee begins or resumes the payment of rentals in the manner and amount hereinbefore provided.  If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and, if production results therefrom, then as long as production continues.

> 17.  It is agreed that this lease shall never be forfeited or cancelled for failure to perform in whole or in part any of its implied covenants, conditions, or stipulations until it shall have first been finally judicially determined that such failure exists, and after such final determination, lessee is given a reasonable time therefrom to comply with any such covenants, conditions, or stipulations.

Under this Lease, Calvin drilled the Wright #1 Well in the Pictured Cliffs Formation. The lessee's interests were assigned to Norman and Loretta Gilbreath on March 1, 1985. Norman and Loretta Gilbreath, and later their assignee Gilbreath Energy, LLC, were operator of the Wright #1 Well.

In July 1994, the New Mexico Oil Conservation Division issued an order stating that it pooled all mineral interests in the Basin-Fruitland Coal Gas Pool, including the Subject Minerals, for the drilling of the Flora Vista #2 Well.  [Doc. 189-3]  Plaintiffs were not given notice of this proceeding.  The Flora Vista #2 Well was drilled in 1994.  The Flora Vista #3 Well was drilled in 2004.

## LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could have an effect on the outcome of the suit.  *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014).  A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the non-moving party.  *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that party.  *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007).  The court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

A party seeking summary judgment bears the initial burden of showing that there is no genuine dispute as to a material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  When that party does not have the burden of persuasion at trial, it can satisfy its burden at the summary judgment stage by identifying a lack of evidence on an essential element of the claim.  *Id*. at 671.  If the movant satisfies its burden, the burden shifts to the non-movant.  *Id*.

The party opposing summary judgment cannot rest on the pleadings, but must go beyond the pleadings and "designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment."  *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The non-movant must "set forth specific facts" from which a rational trier of fact could find in the non-movant's favor, identifying those facts in the affidavits, deposition transcripts, or incorporated exhibits.  *Adler*, 144 F.3d at 671

4

(internal quotation marks omitted).   The party cannot rest on ignorance of the facts, on speculation, or on unsubstantiated conclusory allegations.  *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).   "A fact is 'disputed' in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it; a simple denial, much less an assertion of ignorance, does not suffice."  *Grynberg v. Total S.A.*, 538 F.3d 1336, 1345 (10th Cir. 2008).

## I.   *Energen Defendants' Motion for Summary Judgment No. 1:  Statute of Limitations and Laches* [Doc. 81]

The Energen Defendants filed a motion for summary judgment on the grounds of the statute of limitations and laches.[5]   [Doc. 81]   Plaintiffs filed a response and a supplemental response.   [Docs. 94, 209]   The Energen Defendants filed a reply and supplemental exhibits. [Docs. 104, 217]   Having reviewed the motion, briefs, evidence, and relevant law, the Court concludes that the motion should be granted in part and denied in part.

The claims against the Energen Defendants are:  Count One—Declaratory Relief; Count Two—Quiet Title; Count Three—Accounting; Count Four—Breach of NMSA 1978, § 70-2-18 (Pooling statute); and Count Ten—Negligence.  The Energen Defendants argue that they are entitled to summary judgment dismissing all claims against them on the ground of laches, and alternatively dismissing Counts Three, Four, and Ten on the ground that they are barred by the statute of limitations.

Plaintiffs argue that summary judgment should be denied on the statute of limitations argument because:  (1) they were cotenants and no ouster was shown; and (2) there are disputed

---

[5] Although they did not formally join in this motion, Bayless and Animas raised this issue and relied on the Energen Defendants' motion in their response to Plaintiffs' summary judgment motion on mineral ownership and Lease termination (which is addressed in a separate Memorandum Opinion and Order contemporaneously filed as Doc. 314).  [Doc. 225, pp. 3-4]

factual issues under the discovery rule regarding when Plaintiffs' claims accrued.  Plaintiffs also argue that the Energen Defendants fail to make a showing of prejudice caused by unreasonable delay, which is required for the laches argument.

The SAC appears to assert Counts One and Two against all Defendants.  Other counts are expressly asserted against only some of the Defendants.  Plaintiffs' response appears to admit that Counts One and Two lie only against the Gilbreath Defendants, by arguing that the Energen Defendants lack standing to challenge Count One (regarding Lease termination)[6] and Count Two because those claims are against the Gilbreaths.  [Doc. 94, p. 9]  The Energen Defendants' reply states that they make no claim to title or ownership of the Subject Minerals and argue that for this reason alone Counts One and Two should be dismissed as to the Energen Defendants.  [Doc. 104, pp. 5-6]  The Court agrees and will dismiss Count One (regarding Lease termination) and Count Two against the Energen Defendants.

## A.  Material Facts

The Court views the facts in the light most favorable to Plaintiffs, as non-movants.  The following are undisputed material facts:

(1)  On August 4, 1972, Plaintiffs executed the Lease to Rodney P. Calvin.

(2)  On April 3, 1973, Plaintiff Frank King executed a division order for the Wright #1 Well.  [Doc. 81-1, pp. 15-16]

(3)  Plaintiffs never received royalty payments for production on the Wright #1 Well.

(4)  The Gilbreaths began to act as operator for the Wright #1 Well in 1985.

---

[6] Count One requests declaratory relief on three issues:  that the Subject Minerals have been unleased since at least July 1990, that the Gilbreath Defendants refused to release the Lease, and that the Subject Minerals were never properly pooled.  [SAC, pp. 7-8]  Plaintiffs do not respond to the Energen Defendants' claim of laches regarding Count One to the extent that Count One requests a declaration that the Subject Minerals were not properly pooled.  To the extent that Count One asserts a claim that the Subject Minerals were not properly pooled, the Court concludes that this claim is barred to the same extent that Count Four is barred by the statute of limitations.

(5)   Plaintiff Frank King received the following November 2, 2001 letter from Jerry McHugh, on behalf of San Juan Basin Properties:

> November 2, 2001
>
> Frank King
> 4580 Belfort Place
> Dallas, TX  75205
>
> RE:      Kaempf #1E Well, your MV Interest
>          T30N, R11W, Section 19:  S/2, San Juan County, NM
>
> Dear Mr. King:
>
> Thank you for taking my call on October 31.  We are anticipating a Mesa Verde completion in the above referenced well.  Since you would prefer to not participate in the zones in which you own the minerals, San Juan Basin Properties LLC (SJB) offers you the following:  A two-year lease, 1/8 royalty interest, no bonus, restricted from the base of the Pictured Cliffs Formation to the top of the Dakota.  Said lease shall be a paid up lease form.  We attach a copy here for your review.
>
> If this is appropriate, then we will forward you a lease for your signature and acknowledgement.  Let us know how you would like to proceed.
>
> Regarding your interest in the SG Fruitland well in which you own the minerals, I would suggest that you sign an affidavit of non payment of royalty, stipulating that the royalty due under the terms of the OGL from you to Rodney Calvin, dated August 27, 1972, (714/40) has not been paid since 1990 or late 1980's.  That is when we show last production on the lease.  Therefore, the lease should have been void since the early 1990's.  Then, I propose that SJB lease your minerals under the following terms:  25% royalty interest to you, effective date of first production, no bonus, and restricted from the surface of the earth to the Base of the Pictured Cliffs Formation.  SJB will be responsible for drawing up the documents, demand letters to SG, and legal or other assorted costs associated with the perfecting of title on this matter.  SJB retains the option to cease such efforts for perfection of title and payment of revenues to SJB and you at such time that SJB determines necessary, without prior written notice to you.
>
> Please contact me if you have any questions or comments about this proposal and the materials you requested.
>
> Very Truly Yours,
> SAN JUAN BASIN PROPERTIES LLC
>
> Jerry McHugh, Jr.
>
> Enclosures as indicated

[Doc. 81-2]  The following stamp appears on the bottom of this letter, showing that the letter was admitted in the 2002 pooling hearing before the Oil Conservation Division:

BEFORE THE
OIL CONSERVATION DIVISION
Case No. 12796 Exhibit No. 8
Submitted By:
*San Juan Resources*
Hearing Date:  February 21, 2002

(6)   Sometime around September or October 2001, Frank King had some discussions with Jerry McHugh regarding his company's drilling of an oil and gas well.

(7)   In 2002 Plaintiff Frank King was notified of an Oil Conservation Division ("OCD") hearing regarding compulsory pooling of the Mesa Verde and Dakota formations underlying the same land as the "Subject Minerals."[7]  Frank King was represented by counsel at that hearing and did not object to pooling of his interest.  Frank King received a copy of Order No. R-11762 pooling his interest in the Mesa Verde and Dakota Formations.[8]  [Doc. 81-3, pp. 1-5]

(8)   In 2005 and 2007 there were "some communications" between Plaintiffs and Energen.  [Doc. 94, p. 4, ¶ 18 (Plaintiffs' admission of Energen Defendants' factual allegation)]

(9)   In 2009 Plaintiffs claimed monies from the Texas Comptroller.

(10)  In 2011 Energen sent a tax withholding notice to Plaintiffs.

(11)  Plaintiffs' claims regarding revenues for production from the Pictured Cliff Formation associated with the Wright #1 Well do not relate to the Energen Defendants.

(12)  The Gilbreath Defendants elected to take their share of gas from the Flora Vista Wells in kind and sell such gas, effective August 1, 2005.

---

[7] As stated at the beginning of this Memorandum Opinion and Order, the Court uses "Subject Minerals" to refer to the mineral interest conveyed to Calvin by the 1972 Lease—which interest includes minerals "from the surface of the earth to the base of the Pictured Cliffs Formation only."  These "Subject Minerals" do not include minerals in the lower Mesa Verde and Dakota Formations.

[8] The Energen Defendants allege that the "Subject Interests" were pooled by this Order, using "Subject Interests" to refer to "Plaintiffs' unleased interests in the minerals underlying certain lands within the S/2 of Section 19, Township 30 North, Range 11 West."   [Doc. 81, p. 4, ¶ 2; *id.* pp. 6-7, ¶ 15]   Plaintiffs dispute the Energen Defendants' ¶ 15 to the extent that it alleges that the "Subject Minerals" which are the subject of this suit were pooled; Plaintiffs allege that Pooling Order No. R-11762 pooled only minerals within the Mesa Verde and Dakota Formations.  [Doc. 94, p. 4, ¶ 15; Doc. 209, p. 2, ¶ 15; Doc. 209-4]  Thus it is undisputed, as stated above, that Order No. R-11762 pooled Frank King's interest in the Mesa Verde and Dakota Formations.

The Energen Defendants set forth additional factual allegations, supported by Plaintiffs' responses to interrogatories and requests for admission.  The Court concludes that the following additional facts are established for purposes of the summary judgment motion. [9]

On January 29, 2007, Plaintiffs accepted royalty payments from Energen Resources Corporation for production from the Flora Vista Wells.  [Doc. 81, pp. 7-8, ¶ 18]  The Energen Defendants attach in support Plaintiffs' responses to interrogatories, admitting that on January 29, 2007, "Frank A. King and Paula S. Elmore received royalty checks from Energen for the Flora Vista #19-2 and #19-3 Wells covering the period 9/04 — 7/05."  [Doc. 18-1, p. 5]

The Energen Defendants allege:  "In or about March 2009, Mr. King claimed monies from the Texas Comptroller that had been paid to the State of Texas as unclaimed property by the predecessor operator, SG Interests I, Ltd., for revenues received for production from the Flora Vista No. 2."  [Doc. 81, p. 8, ¶ 19]  The Energen Defendants attach in support:  (1) a copy of a letter dated 05/07/2009 from the Texas Comptroller for Unclaimed Money Fund to Frank King requesting information from the claimant, and referencing "SG Interests I LTD" and State of New Mexico"; (2) Plaintiffs' response to interrogatories, admitting that:  "Frank A. King recovered $9,861.00 from the Texas Comptroller by check dated June 11, 2009 as unclaimed property paid to the state by "SG Interests I, Ltd.," which may be attributable to the Flora Vista Wells"; and (3) a copy of a June 11, 2009 check from the Texas Comptroller to Frank King for unclaimed property in the amount of $9,861.00.  [Doc. 81-3, pp. 12-15]

---

[9] Although Plaintiffs' response purports to deny the allegations discussed in the following two paragraphs, Plaintiffs fail to identify specific contrary evidence in their response, merely citing their affidavits—which do not controvert these particular allegations.  [Doc. 94, p. 4, ¶¶ 18-19 (citing Docs. 95, 96)]  *See Sealock*, 218 F.3d at 1209; *Adler*, 144 F.3d at 671.  Absent identification of contrary evidence, these facts are deemed undisputed for purposes of the summary judgment motion.  *See Grynberg*, 538 F.3d at 1345.

**B.  Statute of Limitations**

**(1) Legal standards for statute of limitations**

"The purpose of a statute of limitations is to protect prospective defendants from the burden of defending against stale claims while providing an adequate period of time for a person of ordinary diligence to pursue lawful claims." *Garcia v. LaFarge*, 1995-NMSC-019, ¶ 14, 893 P.2d 428, 433.  In this diversity action, the Court must apply the State of New Mexico's statute of limitations, including tolling and accrual principles. *Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1210 (10th Cir. 2013); *see Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registr. Sys., Inc.*, 680 F.3d 1194, 1204 (10th Cir. 2011) (exercising diversity jurisdiction, court applies state substantive law with objective of attaining the result that would be reached in state court).

The statute of limitations begins to run when an action accrues.  *Garcia*, 1995-NMSC-019, ¶ 14, 893 P.2d at 433.  "The date from which the statute of limitations begins to run may be extended by New Mexico's discovery rule, under which a 'cause of action does not accrue until the plaintiff discovers' the injury." *Elm Ridge Expl. Co.*, 721 F.3d at 1210 (quoting *Wilde v. Westland Dev. Co.*, 2010-NMCA-085, ¶ 18, 241 P.3d 628, 635).  The statute of limitations begins to run "when the plaintiff acquires knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action"; this is referred to as "inquiry notice." *Yurcic v. City of Gallup*, 2013-NMCA-039, ¶ 9, 298 P.3d 500, 503 (internal quotation marks omitted); *see Gerke v. Romero*, 2010-NMCA-060, ¶ 10, 237 P.3d 111, 115.  The question is whether the plaintiff possesses knowledge that "'would, on reasonable diligent investigation, lead to knowledge of'" the injury. *Wilde*, 2010-NMCA-085, ¶ 18, 241 P.3d at 635 (quoting *Ambassador E. Apts., Inv'rs v. Ambassador E. Invs.*, 1987-NMCA-135, ¶ 7, 746 P.2d 163, 165)).  Actual knowledge is not

required.  *Rhinehart v. Nowlin*, 1990-NMCA-136, ¶ 39, 805 P.2d 88, 97.  "Whatever puts a party upon inquiry is sufficient 'notice' and the party has a duty to inquire or he will be chargeable with all the facts."  *Id.*; *see Yurcic*, 2013-NMCA-039, ¶ 9, 298 P.3d at 504.

"The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action."  *Coslett v. Third St. Grocery*, 1994-NMCA-046, ¶ 24, 876 P.2d 656, 664. Whether the plaintiff knows that those facts establish a legal cause of action is not relevant. *Christus St. Vincent Reg'l Med. Ctr. v. Duarte-Afara*, 2011-NMC-112, ¶ 29, 267 P.3d 70, 77. The statute of limitations begins to run even though the plaintiff lacks knowledge of the full extent of the injury.  *Gerke*, 2010-NMCA-060, ¶ 10, 237 P.3d at 115.

"When a defendant makes a prima facie showing that a claim is time barred, a plaintiff attempting to invoke the discovery rule has the burden of 'demonstrat[ing] that if [he or] she had diligently investigated the problem [he or] she would have been unable to discover' the facts underlying the claim."  *Butler v. Deutsche Morgan Grenfell, Inc.*, 2006-NMCA-084, ¶ 28, 140 P.3d 532, 539 (involving motion to dismiss); *see Yurcic*, 2013-NMCA-039, ¶¶ 28-30, 298 P.3d at 508-09 (discussing shifting burdens of proof).  The party invoking the discovery rule has the burden of demonstrating that it lacked knowledge of the cause of action and, even if that party had diligently investigated, it could not have discovered the problem or the cause of injury. *Martinez v. Showa Denko, K.K.*, 1998-NMCA-111, ¶ 22, 964 P.2d 176, 181 (involving summary judgment motion); *McNeill v. Rice Eng'g & Operating Inc.*, 2006-NMCA-015, ¶ 40, 128 P.3d 476, 486 (addressing plaintiffs' burden in opposing summary judgment motion).  In *Martinez*, the court held that even though there were divergent medical opinions regarding the cause of the plaintiff's injuries, the statute of limitations began to run because the plaintiff had information that there was a "possible connection" between her injuries and a dietary supplement; this

information would put a reasonable person on notice. *Martinez*, 1998-NMCA-111, ¶¶ 24-25, 964 P.2d at 182 (emphasis added).

"'Historically, [New Mexico courts] have characterized the application of the discovery rule as a jury question, particularly when conflicting inferences may be drawn.'" *Yurcic*, 2013-NMCA-039, ¶ 10, 298 P.3d at 504 (quoting *Williams v. Stewart*, 2005-NMCA-061, ¶ 16, 112 P.3d 281, 286).  Of course, when relevant facts are undisputed, summary judgment may be granted. *See id*. ¶¶ 19-22, 298 P.3d at 506-07 (affirming summary judgment on the point that plaintiff had inquiry notice of claims against City before two-year statute of limitations period). And, although sitting in diversity, this Court applies federal procedure concerning summary judgment standards at any event.

### (2) Accrual of claims

New Mexico law does not specifically and explicitly set a statute of limitations for Count Ten (Negligence).  Count Four asserts a claim under Section 70-2-18(B) (the "Pooling statute"), contained in the Oil & Gas Act, which contains no explicit statute of limitations.  NMSA 1978, §§ 70-2-1 to -38 (1989).  A broadly worded New Mexico statute establishes a "catchall" statute of limitations of four years:

> Those founded upon accounts and unwritten contracts; those brought for injuries to property or for the conversion of personal property or for relief upon the ground of fraud, and all other actions not herein otherwise provided for and specified within four years.

NMSA 1978, § 37-1-4 (1880).  The Energen Defendants argue that the statute of limitations for Counts Four and Ten is four years—the catchall statute of limitations.   Plaintiffs suggest, in a footnote, that Section 37-1-4 does not apply to Section 70-2-18(B)—apparently suggesting that there is no statute of limitations at all under the Oil & Gas Act.  Plaintiffs provide no authority to support this suggestion.  Section 37-1-4 is broadly worded, and has been broadly applied.  *See*

*Altman v. Kilburn*, 1941-NMSC-023, ¶ 15, 116 P.2d 812, 814-15 ("All other cases not expressly provided for establishes a bar to all suits not specifically mentioned." (internal quotation marks omitted)); *Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 336 (10th Cir. 1994) (applying Section 37-1-4 to various state law statutory claims).  The Court believes that the clear, broad language of Section 37-1-4 makes it applicable to statutes that do not "otherwise" provide for a statute of limitations.  The Energen Defendants cite New Mexico cases applying Section 37-1-4 to statutory causes of action.  *See Martinez v. Cornejo*, 2009-NMCA-011, ¶ 28, 208 P.3d 443, 452 (applying four-year statute of limitations of Section 37-1-4 to violation of Trade Practices and Frauds Act); *see also Plaatje v. Plaatje*, 1981-NMSC-040, ¶ 8, 626 P.2d 1286, 1287 (holding that four-year statute of limitations of Section 37-1-4 clearly applies to suits under NMSA 1978, § 40-4-20 (1993), which statute does not specifically set a statute of limitations, and rejecting party's suggestion that there was no statute of limitations as resulting in manifest injustice).  The Court concludes that the catchall four-year statute of limitations applies to the claims under Counts Four and Ten.

New Mexico law does not explicitly set a statute of limitations for Count Three—Accounting.  A suit for an accounting sounds in equity if the parties' relationship creates an equitable duty to account.  9 Charles Alan Wright et al., *Federal Practice & Procedure* § 2310 (3d ed. updated 2015).  But a claim using the term "accounting" may also denote what is in essence a legal claim for damages.  Although Count Three requests an accounting, the Court "must look beyond the relief sought and determine the true nature of the underlying claim upon which the prayer for relief is itself predicated.  *Bruce v. Bohanon*, 436 F.2d 733, 736 (10th Cir. 1970).  Plaintiffs' choice of words in the SAC does not determine whether a claim is legal or equitable.  *See id.* (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477-78 (1962)).  The Court

concludes that "the true nature of the underlying claim" against the Energen Defendants "sounds in law—not in equity—and that the core issue" presents legal issues:  violation of the Pooling statute and negligence.  *Bruce*, 436 F.2d at 736.  Count Three is only a nominally equitable claim that is really a legal claim for damages for a statutory violation and negligence.  *See* 9 Wright et al., *Federal Practice & Procedure* § 2310.  The Court therefore concludes that Count Three is also governed by New Mexico's catchall four-year statute of limitations.

Having determined the statute of limitations for Counts Three, Four, and Ten, the Court must determine when these claims accrued.  The Energen Defendants allege, and Plaintiffs admit, that oil and gas revenue payments are "generally" made on a monthly basis.  [Doc. 81, p. 8, ¶ 21; Doc. 94, p. 5, ¶ 21]  The Energen Defendants argue that each monthly revenue payment not made gives rise to a separate cause of action, and the statute of limitations on each payment "begins running anew each month in which a payment is due."  [Doc. 81, p. 14]  They conclude that the statute of limitations ran out on all claims for payments due more than four years before the original complaint was filed; therefore, Plaintiffs' claims should be limited to payments due on or after September 10, 2009.

The Court generally agrees with the Energen Defendants' analysis.  Although the Court concludes that the claims accrue each day rather than each month, this determination leads to the same conclusion.

Payments under an oil and gas lease may generally be due each month.  But the Court has concluded that the Lease automatically expired on July 1, 1990.[10]  The issue presented in this case is when Plaintiffs' claims accrued in absence of a lease or other contract.  In deciding this issue, New Mexico law distinguishes between a "continuing" or "temporary" injury and a

---

[10] The Court made this conclusion in a separate Memorandum Opinion and Order contemporanously filed as Doc. 314 (Section II).

"permanent" injury. *McNeill v. Rice Eng'g & Operating Inc.*, 2006-NMCA-015, ¶¶ 28-29, 128 P.3d 476, 483-84.

In *McNeill*, property owners brought suit against the operators of a system disposing of salt water (a waste product from oil and gas drilling operations) by injecting it into a disposal well on the plaintiff property owners' land; the salt water was transported by pipeline from oil and gas drilling sites. *Id.* ¶ 2, 128 P.3d at 477-78. The plaintiffs asserted claims of trespass and conversion relating to the disposal of salt water over a span of thirty-six years. *Id.* The plaintiffs filed their suit on October 27, 1998. The plaintiffs relied on a "continuing trespass theory," so that each disposal of salt water was an aggravation or continuation of the original disposal and the statute of limitations did not begin to run until the date of the latest disposal (i.e., the date of the latest trespass). *Id.* ¶ 24, 128 P.3d at 482. Under this theory, the cause of action would not accrue until the wrong was "over and done with." *Id.* ¶ 25, 128 P.3d at 482.

The *McNeill* court disagreed, concluding that the trespass was not the disposal well itself or the injury caused by that well per se, but instead the trespass occurred with each injection of salt water into the subsurface of the plaintiffs' land. *Id.* ¶ 27, 128 P.3d at 483. Rejecting the argument that a cause of action for thirty-six years of activity did not accrue until the date of the last disposal, the New Mexico Court of Appeals held the better rule was that the "accrual date is the date of each particular injury which, for an intermittent injury, is the date of that discrete injury, or for a continuous injury, each new day." *Id.* ¶ 29, 128 P.3d at 483-84. *McNeill* concluded that the four-year statute of limitations barred plaintiffs' claims for salt water disposal effected before October 27, 1994; the plaintiffs could only claim for disposal made within the

four years preceding filing of the complaint (unless the discovery rule extended the date of accrual).[11] *Id.*

*McNeill* explicitly approved and adopted the rule set forth by the Tenth Circuit in *Hess*, in which the Tenth Circuit construed a federal statute of limitations, 28 U.S.C. § 2415(b). *United States v. Hess*, 194 F.3d 1164 (10th Cir. 1999). § 2415(b) states that an action by the United States for money damages resulting from a trespass on the lands of the United States may be brought within six years and ninety days after the right of action accrues. The United States brought a trespass claim against the Hess family for extraction of gravel. The Tenth Circuit stated: "The crucial question in regard to the applicability of the statute of limitations for trespass is whether the injuries sustained are permanent (fixed) or continuing (sometimes referred to as 'temporary')." *Hess*, 194 F.3d at 1176 & n.12. The Tenth Circuit held that "the continuing series of gravel extractions and sales" constituted a "continuing trespass," so that the limitation period barred recovery for gravel extractions occurring more than six years and ninety days before filing of the complaint. *Id.* The Tenth Circuit stated that it could not agree with the Hess family that the government's action was totally barred, or with the government that it was entitled to damages all the way back to the first trespass. Instead, damages were recoverable for the period six years and ninety days before filing of the complaint.

Relying on *Tiberi*, Plaintiffs' response argues—in a footnote—that the "continuing wrong" doctrine applies so that the statute of limitations for a continuing or repeated injury only begins to run from the date of the last injury, when "'the wrong is over and done with.'" [Doc.

---

[11] After affirming partial summary judgment on the point that the statute of limitations ran from each new injury or each new day, *McNeill* proceeded to the discovery rule issue and concluded that there were genuine issues of material fact as to whether the plaintiffs knew of or should have discovered the injury by the exercise of reasonable diligence. *McNeill*, 2006-NMCA-015, ¶¶ 36-40, 128 P.3d at 485-86. The court concluded that the record did not show whether the plaintiffs, in opposing the summary judgment motion, could satisfy their burden to prove that they did not know or and should not have discovered the injury. *Id.* ¶ 40, 128 P.3d at 486.

94, p. 19 n.5] *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1429 (10th Cir. 1996). But the Tenth Circuit distinguished between the "continuing wrong" and "continuing trespass" theories in *Hess*, and explained that *Tiberi* was inapplicable because it involved fraudulent concealment—not at issue in *Hess*, or in the case brought by Plaintiffs. *Hess*, 194 F.3d at 1176. *McNeill*, along with its explicit approval and adoption of *Hess*, shows that Plaintiffs' argument is wrong. The Court thus rejects Plaintiffs' argument that the statute of limitations did not even begin to run before they filed the original complaint in 2013. [Doc. 94, p. 19 n.5]

In their response, Plaintiffs' main argument is that they became cotenants with the Energen Defendants and the statute of limitations did not begin to run because there was no ouster.[12]   [Doc. 94, pp. 14-18]   The Energen Defendants' reply argues that they were not cotenants, no ouster was required, and the statute of limitations therefore ran from each accrual date. [Doc. 104, pp. 7-10]   The same arguments were made in briefing on the Gilbreath Defendants' motion for summary judgment [Doc. 193]; the Court agrees with Defendants' arguments on this point, as discussed below. (*See* Section II, below.)

The facts of Plaintiffs' case (continuing extraction of gas) are very similar to the facts of *Hess* (continuing extractions of gravel) and *McNeill* (continuing disposal of salt water). The analysis of *McNeill* and *Hess* is applicable here. The Court concludes that the statute of limitations began to run with each new extraction of gas (or with each new day, if gas extraction was continuous). *See McNeill*, 2006-NMCA-015, ¶ 29, 128 P.3d at 483. To the extent their claims are for unpaid revenues, Plaintiffs are limited to claims for production after September 10, 2009—the four years preceding filing of the original complaint (unless the discovery rule extended the date of accrual).

---

[12] The Court notes that this argument is inconsistent with Plaintiffs' argument that the Energen Defendants lack standing under Counts One and Two. [Doc. 94, pp. 8-9]

As asserted against the Energen Defendants, Count Ten alleges that they failed to exercise reasonable care to determine Plaintiffs' ownership of the Subject Minerals and termination of the Lease. To the extent that Count Ten asserts a claim against the Energen Defendants for failure to properly pool the Subject Minerals, it may duplicate Count Four. Assuming, however, that Count Ten includes further claims against the Energen Defendants for additional revenue, Plaintiffs are limited to claims for revenues due after September 10, 2009 (unless the discovery rule extended the date of accrual).

The purpose of seeking an accounting under Count Three is to obtain payment of revenues to which Plaintiffs would be entitled. For any such revenues due daily, under *McNeill*, the Court concludes that Plaintiffs' claim under Count Three is limited to revenues due after September 10, 2009. There would be no point in an accounting against the Energen Defendants for revenues which Plaintiffs could not collect.

Count Four presents a different situation. The claim is that the Energen Defendants are liable for failure to properly pool the Subject Minerals in 1994. The Pooling statute allows recovery of "either the amount to which each interest would be entitled if pooling had occurred or the amount to which each interest is entitled in the absence of pooling, whichever is greater." NMSA 1978, § 70-2-18(B). Under the principles of *McNeill* and *Hess*, Count Four asserts that the injury occurred in 1994, when the allegedly improper pooling occurred; although the potential damages continue over time, they flow from the original injury in 1994. *See Yurcic*, 2013-NMCA-039, ¶ 25, 298 P.3d at 507. Thus the four-year statute of limitations ran from 1994 and Plaintiffs' claim under Count Four is entirely barred (unless the discovery rule extended the date of accrual).

### (3)  The discovery rule

Plaintiffs argue that they "had no reason to believe that an action was necessary to enforce the prior lease termination or that there were unpaid revenues being withheld from them regarding the Flora Vista Wells prior to 2012."  [Doc. 94, p. 19]  Since the Court has concluded that the Lease terminated automatically on July 1, 1990,[13] the Court agrees that no action by Plaintiffs was necessary to terminate the Lease.  This conclusion does not resolve the second part of Plaintiffs' argument—whether they had inquiry notice that there were unpaid revenues.  The issue under the discovery rule is when Plaintiffs had knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry about the status of the Subject Minerals and whether there were unpaid revenues due to Plaintiffs.

The Energen Defendants have the burden of making a prima facie showing that Plaintiffs' claims are barred.  *See Butler*, 2006-NMCA-084, ¶ 28, 140 P.3d at 539; *Yurcic*, 2013-NMCA-039, ¶¶ 28-30, 298 P.3d at 508-09.  As the party invoking the discovery rule in response to a summary judgment motion, Plaintiffs then have the burden of demonstrating both that they lacked knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry, and that they would have been unable to discover the facts underlying their claims if they had diligently investigated.  *Butler*, 2006-NMCA-084, ¶ 28, 140 P.3d at 539; *Martinez*, 1998-NMCA-111, ¶ 19, 964 P.2d at 181; *Blea v. Fields*, 2005-NMSC-029, ¶ 28, 120 P.3d 430, 440; *see Elk Ridge Expl. Co.*, 721 F.3d at 1211 (explaining that to defeat a summary judgment motion under New Mexico law, a plaintiff invoking the discovery rule must demonstrate that he would have been unable to discover the cause of injury if he had diligently investigated).  The New Mexico Courts have applied the discovery rule in numerous cases,

---

[13] The Court made this conclusion in a separate Memorandum Opinion and Order contemporanously filed as Doc. 314 (Section II).

including a case involving claims of trespass and conversion in connection with oil and gas drilling. *See McNeill*, 2006-NMCA-015, ¶¶ 30-40, 128 P.3d at 484-86.

In *Grace*, Grace Oil Company ("Grace") filed for a declaratory judgment that it was entitled to recover overpayment of royalties made to the City of Carlsbad over a sixteen-year period. *City of Carlsbad v. Grace,* 1998-NMCA-144, ¶ 1, 966 P.2d 1178, 1180.  Grace claimed that its suit (filed in 1992) was timely because the statute of limitations did not begin to run until 1990, when Grace discovered the error in payment. *Id.* ¶ 5, 966 P.2d at 1181.  The New Mexico Court of Appeals disagreed, stating that it was Grace's responsibility to ensure that it correctly remitted payments to the City.  The error could have been discovered if Grace had examined its accounting records during the sixteen-year period. *Id.* ¶ 7, 966 P.2d at 1181.  Grace asserted "no reason for its failure to discover the accounting error other than that its practice is not to check on past payments." *Id.* ¶ 8, 966 P.2d at 1181.  The court stated that Grace, as the party claiming that the statute of limitations should be tolled, had the burden of setting forth sufficient facts to support its position; because Grace did not allege sufficient facts to excuse its lack of diligence, the court held that the statute of limitations was not tolled. *Id.*

In *Yurcic*, the plaintiffs Susan and Johnna Yurcic filed suit in 2008 for damages to a building caused by an adjacent flood retention pond. *Yurcic v. City of Gallup*, 2013-NMCA-039, 298 P.3d 500.  A former tenant noticed and informed Johnna that there was a crack in the foundation where the ground was saturated; the tenant told Johnna that he believed the pond was the cause of the building's damage. *Id.* ¶ 15, 298 P.3d at 505.  The trial court granted summary judgment against the plaintiffs, determining that this conversation gave them inquiry notice of their claim against the city.  The New Mexico Court of Appeals approved of the trial court's

grant of summary judgment on this point.[14]  *Id.* ¶¶ 19-22, 298 P.3d at 505-07.  Susan Yurcic argued that the tenant's conversation with Johnna Yurcic (who died during pendency of the suit) did not give Susan inquiry notice.  But the court rejected this argument, holding that "the requirement of diligence as a co-owner" of the building warranted enforcement of the statute of limitations against Susan, because if she "had been reasonably diligent as a co-owner, she should have, at a minimum, communicated with her co-owner or tenant regarding the status of her property."  *Id.* ¶ 21, 298 P.3d at 506.  "The assertion that [Susan] did not engage in communications regarding the seepage and damage, and the absence of her actual knowledge of it, does not absolve [Susan] of her duty to be reasonably diligent in discovering the injury and cause."  *Id.*  *Yurcic* shows that New Mexico law imposes a significant duty to investigate potential claims.

The Energen Defendants argue that Frank King had inquiry notice of Plaintiffs' claims in 2001, when he received the letter from Jerry McHugh.  The Energen Defendants argue that Plaintiffs acquired further knowledge in 2007 and 2009 of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry.  In 2007 Plaintiffs received division orders from Energen for the Flora Vista Wells, and also accepted royalty checks from Energen for the Flora Vista Wells.  In 2009, Plaintiffs claimed $9,861 from the Texas Comptroller, which was "unclaimed property paid to the state  by 'SG Interests I, Ltd.,' which may be attributable to the Flora Vista Wells."  [Doc. 81-3, p. 12]  The Energen Defendants argue that the statute of limitations thus bars claims arising before September 10, 2009.  Plaintiffs' response invokes the discovery rule in opposing the summary judgment motion, arguing that they had no notice of their claims until 2012.  [Doc. 94, pp. 10, 18-20]

---

[14] This Court's discussion of *Yurcic* refers to relevant points only.  The trial court's grant of summary judgment was reversed on another ground, and *Yurcic* was complicated by uncertainty of dates and different statutes of limitation applicable against the city and other defendants.

It is undisputed that Frank King received the 2001 letter from Jerry McHugh.   The Energen Defendants argue this letter informed Frank King that:   production under the 1972 Lease to Calvin had ceased for more than sixty days; the Lease had therefore expired; and production had occurred at least up to 1990—production for which Frank King received no payment.   Frank King knew there had been production earlier because of the 1973 division order he signed, for the Wright #1 Well, which was drilled in the Pictured Cliffs Formation; he testified in his deposition that this division order showed that the well had been drilled and was producing.   [Doc. 217-1, pp. 2-4; *see* Doc. 81-1, pp. 15-16; Doc. 81-2, p. 1]   The 2001 letter advised Frank King to sign an affidavit of non payment of royalty and proposed that San Juan Basin Properties lease the minerals.   The 2001 letter referred to the 1972 Lease to Rodney Calvin, and then referred Frank King to "your interest in the SG Fruitland well in which you own the minerals."   The Energen Defendants argue that, by suggesting that demand letters should be submitted to SG, the letter informed Frank King that SG was the operator and was producing gas from a well in the Fruitland Formation—a well  in which Frank King owned the minerals.   But the 1973 Division Order that Frank King had signed was for production by Calvin, from the Wright #1 Well, limited to the Pictured Cliffs Formation.   [Doc. 81-1, pp. 15-16] The 2001 letter thus told Frank King that there was another well, in a different formation, with a different operator, directed at Frank King's minerals—even though the Calvin Lease had expired.

The Energen Defendants argue that the 2001 letter told Frank King that there was production from another well, in the Fruitland Formation, which was purportedly unleased. Frank King could connect this information with the Subject Minerals—because King stated in his affidavit that he owned no other mineral interest in New Mexico except for that conveyed by

22

the 1973 mineral deed.   [Doc. 95, p. 2, ¶ 4; Doc. 96, p. 2, ¶ 3 (Plaintiff Paula Elmore stating same)]

Plaintiffs argue that SG did not operate the Fruitland well and that the letter therefore "did not provide information on which Plaintiffs should have relied."[15]   [Doc. 94, p. 3, ¶ 9] Plaintiffs' argument misunderstands the issue.   The issue is not whether the 2001 letter was correct in every detail and should have been accepted without question, but instead whether it informed Frank King of matters that would have caused a reasonable person to make an inquiry. Inquiry notice is the issue.  *See Yurcic*, 2013-NMCA-039, ¶ 9, 298 P.3d at 503; *cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1349 (10th Cir. 2008) (applying Colorado law and concluding that newspaper articles would have caused reasonable person to pursue the matter and acquire knowledge of cause of action, even if some articles contained inconsistent and incomplete information).  If, for instance, Plaintiffs had not heard of SG or the Fruitland well,[16] or knew that SG did not operate the Fruitland well, or did not know to what operation the 2001 letter referred, the letter would have put a reasonable person on notice that investigation was warranted. Plaintiffs' only mineral interests in New Mexico were those conveyed by the 1973 mineral deed. [Doc. 95, p. 2, ¶ 4; Doc. 96, p. 2, ¶ 3]   Once Frank King was notified that there was some operation on Plaintiffs' minerals of which he was unaware, he "had a clear duty to try to ascertain who was responsible."  *Butler*, 2006-NMCA-084, ¶ 36, 140 P.3d at 541.  The New Mexico Court of Appeals held that "the duty to inquire includes the duty to attempt to determine the identity of the wrongdoer."  *Id*.  A plaintiff who makes no attempt to fulfill this "clear duty," and provides "no justification for his failure to do so," cannot sit back and do nothing, and then be allowed to file a suit many years later.  *Id*.  The issue is whether the letter gave him reason to think

---

[15] The Court notes that the Energen Defendants assert that SG was in fact the operator.

[16] Frank King's affidavit appears to state that he knew nothing of any operations or wells involving the Subject Minerals except for the Wright #1 Well, with lessee Calvin.  [Doc. 95, pp. 2-3, ¶¶ 6-7]

something was going on which a reasonable person would look into.  The *Yurcic* court did not demand a showing that the tenant was reliable, or had his facts right; the issue was simply whether he alerted the plaintiffs to a possible problem with their building that was possibly connected to the flood retention pond.  Similarly, the 2001 letter alerted Frank King to possible operations involving his mineral interests.  As in *Butler*, Plaintiffs made no attempt to fulfill a duty to investigate and provided no justification for their failure to do so.

Plaintiffs argue that the 2001 letter gave Frank King no reason to believe there was any need to do anything if the Lease had expired for non-production.  [Doc. 94, p. 10; *see* Doc. 95, p. 3, ¶ 7]  It is true that if his only concern were termination of the Lease, he did not need to do anything (because the Lease automatically expired).  But Plaintiffs' only concern is not termination of the Lease; Plaintiffs want revenues for production that occurred after expiration.

The Energen Defendants allege that the Subject Minerals were force pooled in 2002, and that Frank King was represented by an attorney in a hearing and did not object to the pooling. [Doc. 81, pp. 6-7; Doc. 81-3, p. 1 (pooling uncommitted interests from surface to base of Dakota formation, presently including but not necessarily limited to Blanco Mesa Verde and Basin-Dakota)]  Plaintiffs allege, however, that the 2002 order pooled only interests within formations below the Subject Minerals—the Dakota and Mesa Verde Formations.  [Doc. 94, p. 4; Doc. 209, p. 209-4, pp. 1-5]  In deciding the summary judgment motion, the Court accepts that the 2002 order did not affect the Subject Minerals.  *See Shero*, 510 F.3d at 1200 (court must view facts in light most favorable to non-movant).  The 2002 pooling therefore does not support the Energen Defendants' argument on inquiry notice; neither, however, does the 2002 pooling undercut the rest of the Energen Defendants' argument on the discovery rule.

The Energen Defendants argue that, in addition to the 2001 letter, events in 2007 show that Plaintiffs had inquiry notice.   Plaintiffs admit that, on January 18, 2007, Energen sent proposed division orders to Plaintiffs regarding the Flora Vista Wells; Paula Elmore signed and sent back her division order.   [Doc. 81-1, p. 5 (Plaintiffs' responses to interrogatories)]   And Frank King admitted in his deposition testimony that a division order showed that there was production from a well.   Then Plaintiffs received royalties for the Flora Vista Wells.   Plaintiffs admitted in their responses to interrogatories that on January 29, 2007, Frank King and Paula Elmore "received royalty checks from Energen for the Flora Vista #19-2 and #19-3 Wells covering the period 9/04 — 7/05."  [Doc. 81-1, p. 5]  These royalty checks confirmed that there was production on Flora Vista Wells.

Then, in early 2009, Plaintiffs obtained unclaimed funds relating to "SG Interests" and the State of New Mexico.   The March 5, 2009 and May 7, 2009 letters from the Texas Comptroller, used to obtain these unclaimed monies, both referenced "State of New Mexico" and "SG Interests."   [Doc. 81-3, pp. 14-15]   Plaintiffs admit in their response to interrogatories: "Frank A. King recovered $9,861.00 from the Texas Comptroller by check dated June 11, 2009 as unclaimed property paid to the state by 'SG Interests I, Ltd.,' which may be attributable to the Flora Vista Wells."  [Doc. 81-3, p. 12]  The Energen Defendants persuasively argue that Frank King could figure out that these monies were attributable to production from the Subject Minerals—because the only mineral interests that Plaintiffs owned in New Mexico were those obtained through the 1973 deed.  [Doc. 81, p. 12]

Plaintiffs submitted Frank King's affidavit stating that sometime in 2009 he "recovered some monies from the Texas Comptroller that were paid to the State of Texas in my name," and

that he "did not know exactly what this related to at the time."  [Doc. 95, p. 4, ¶ 10]  Plaintiffs

submitted Paula Elmore's affidavit stating:

> Sometime in 2009 I received a check from the Texas Comptroller for monies paid
> to the State of Texas in my name.  I did not know what exactly this related to at
> the time, and nothing on the check alerted me that there was anything else that
> needed to be done.

[Doc. 96, p. 3, ¶ 7]  Plaintiffs argue that they could claim this money without any duty to try to

determine its source.

Plaintiffs argue that they should not be expected to have "connected the dots" and put

together a connection among all of these events.  But the issue is whether there were enough

indications that something was going on with the Subject Minerals so that a reasonable person

would be caused to make an inquiry.  The 2001 letter and the 2009 letters regarding unclaimed

monies both referred to SG Interests and New Mexico mineral interests.  Plaintiffs admitted to a

number of communications with Energen in 2005 and 2007.  Paula Elmore executed a division

order and returned it to Energen in 2007.  The 2007 royalty checks referred to the Flora Vista

Wells, and referred to production in 2004 and 2005.  Plaintiffs owned only one mineral interest

in New Mexico.  Plaintiffs knew of the Wright #1 Well, drilled in the Pictured Cliffs Formation,

by Calvin.  But in 2001, 2007, and 2009, Plaintiffs saw references to different wells (the Flora

Vista Wells), drilled in a different formation (Fruitland), with different operators (SG Interests

and Energen).[17]  Knowledge of these facts and circumstances would have caused a reasonable

person to make an inquiry—at latest by March 2009.

The question is whether Plaintiffs can exert themselves to obtain substantial amounts of

unclaimed money in March to May 2009—with references to the State of New Mexico and SG

---

[17] The 2002 pooling could not account for these royalties and unclaimed monies.  As Plaintiffs assert, that Pooling
Order affected only the Mesa Verde and Dakota Formations.  [Doc. 94, p. 4, ¶ 15]  The Pooling Order related to the
"Kaempf Well No. 1E."  [Doc. 81-3, p. 1; *see* Doc. 81-2 (2001 McHugh letter referencing Kaempf #1E Well, in the
Mesa Verde Formation)]

Interests—and at the same time claim that they had no information about the source of the money and had no duty to inquire. These events were connected to New Mexico mineral interests. Plaintiffs owned no other mineral interests in New Mexico. Both Plaintiffs' affidavits state that they "did not know exactly what this related to." The Court concludes that no rational jury could find that a reasonable person who obtained a substantial check under these circumstances would not have been caused to make an inquiry. A reasonable person cannot claim this was a windfall warranting no effort to look into the matter. In addition, Plaintiffs received royalty checks in 2007 from the Flora Vista Wells, and Frank King received the 2001 letter.

The Court concludes that, at the latest by March or May of 2009, Plaintiffs had knowledge of facts and circumstances that would have caused a reasonable person to make an inquiry leading to discovery of the facts underlying Plaintiffs' claims against the Energen Defendants.[18] *See Yurcic*, 2013-NMCA-039, ¶ 9, 298 P.3d at 503. The Court concludes that the Energen Defendants have made a prima facie showing that Plaintiffs' claims for the period before September 10, 2009, are time barred, because Plaintiffs had inquiry notice more than four years before the original complaint was filed on September 10, 2013.

Once the Energen Defendants made this prima facie showing, the burden shifted to Plaintiffs. Plaintiffs' affidavits are sufficient to show that they lacked actual knowledge. *See Shero*, 510 F.3d at 1200 (on summary judgment motion, court views facts in light most favorable to non-movants). But Plaintiffs had the burden to further demonstrate that they would have been unable to discover the facts underlying their claims if they had diligently investigated:

---

[18] The Court need not decide whether Plaintiffs had inquiry notice earlier. A conclusion that Plaintiffs had inquiry notice in 2001, or 2007, would lead to the same conclusion—that claims for the period before September 10, 2009, are time barred.

> Even applying the discovery rule, in order to refute Defendant's prima facie showing that Plaintiff filed her lawsuit outside the time limitation of the statute of limitations, it was incumbent upon Plaintiff to demonstrate that if she had diligently investigated the problem she would have been unable to discover the cause of her injury.

*Martinez*, 1998-NMCA-111, ¶ 22, 964 P.2d 176; *see Butler*, 2006-NMCA-084, ¶ 28, 140 P.3d at 539 ("When a defendant makes a prima facie showing that a claim is time barred, a plaintiff attempting to invoke the discovery rule has the burden of 'demonstrat[ing] that if [he or] she had diligently investigated the problem [he or] she would have been unable to discover' the facts underlying the claim." (quoting *Martinez*, 1998–NMCA–111, ¶ 22, 964 P.2d 176, and applying same standard to motion to dismiss)); *see Yurcic*, 2013-NMCA-039, ¶¶ 29-30, 298 P.3d at 508-09 (holding that defendant who asserts the affirmative defense of statute of limitations as grounds for summary judgment carries the burden of making prima facie showing as to each element, and then burden shifts to plaintiff to produce evidence to the contrary).

Plaintiffs' bare and unsupported assertions that they could not have discovered their injuries before September 10, 2009, are insufficient.  Plaintiffs were required to demonstrate that they would have been unable to discover the facts if they had diligently investigated.  *See Coslett*, 1994-NMCA-046, ¶ 24, 876 P.2d at 664 ("The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action."); *Duarte-Afara*, 2011-NMC-112, ¶ 29, 267 P.3d at 77 (whether plaintiff knows those facts establish a legal cause of action is not relevant).  Plaintiffs provide no such demonstration.  Plaintiffs do not attempt to show that, had they diligently investigated the status of their New Mexico mineral interests (which involved only this one property), they could not have discovered the facts underlying their current causes of action.

Even if there were no burden on Plaintiffs, however, there is evidence to show that reasonably diligent investigation would have led to discovery. The Energen Defendants cite Frank King's deposition testimony that nothing would have prevented him back in 2001 from obtaining the production records and filing this lawsuit. [Doc. 217-1, p. 9, at 154:12-15] Deposition testimony from Plaintiffs' proffered expert states that New Mexico production records back to 1987 are available online. [Doc. 175-2, pp. 2-3, at 57:17-25] Production records are a matter of public record. Frank King had extensive experience in the industry. [Doc. 81, p. 4; 81-1, pp. 2-3; Doc. 217-1, pp. 5-8] With his experience, he could have obtained those production records to find out what was going on with his mineral interests in New Mexico.[19] *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1349 (10th Cir. 2008) (applying Colorado law regarding inquiry notice issue and holding that sophisticated business person can be expected to check public information). In addition, Plaintiffs could have inquired further of Jerry McHugh, after receiving his 2001 letter, and could have inquired further of Energen, with whom they had a number of communications in 2005 and 2007.

Paula Elmore has no claim to any revenues before December 28, 2006, because she did not have title to the Subject Minerals until Frank King conveyed a 50% interest in them on that date. [Doc. 95; Doc. 182-14] Without citation to authority, Plaintiffs' response contends that Paula Elmore is not subject to the same notice standard as Frank King, because she did not have the same level of experience and knowledge. [Doc. 94, pp. 15, 20] The Court is aware of a New Mexico case holding that the discovery rule allows a court to consider "the individual expertise and sophistication" of the plaintiffs. *Ambassador E. Apts., Inv'rs v. Ambassador E. Invs.*, 1987-

---

[19] Plaintiffs admit that "Frank King has knowledge and experience in searching public records to discover whether there has been oil and gas production on a particular property." [Doc. 195-5, p. 2] The Court also notes that later investigation, conducted by Frank King's son, led to discovery of forced pooling, production, and possible revenues owed. [Doc. 224-2, p. 5, ¶ 13 (Frank King's affidavit)]

NMCA-135, ¶ 8, 746 P.2d 163, 165.  The New Mexico Court of Appeals affirmed summary judgment for the defendants, holding that there was no genuine issue of material fact that the purchasers should have known at the time of sale that the vendors had misrepresented the square footage in the apartment complex.  In view of the purchasers' real estate backgrounds, their prior purchases of other apartment complexes, the survey provided before closing, and deposition testimony from one purchaser (imputed to the other) that he was concerned about the square footage, the trial court could properly determine as a matter of law that the plaintiffs should have known of the misrepresentation at the time of sale.  *Id*. ¶¶ 12-17, 746 P.2d at 166.  There was no "viable issue of fact" as to when the limitations period began; it began to run before closing and the plaintiffs' suit more than five years later was barred by the four-year statute of limitations under NMSA 1978, § 37-1-4.  *Id.* ¶¶ 7, 19, 746 P.2d at 165, 167.

Taking Frank King's extensive experience and expertise in the field, the Court concludes that he had inquiry notice at latest by March 2009, when he claimed "unclaimed monies" from the Texas Comptroller; his admission that he "did not know exactly what this related to" strongly supports the conclusion that a reasonable person accepting a substantial check would be caused to make an inquiry leading to discovery of unpaid revenues from the Subject Minerals.  *See Yurcic*, 2013-NMCA-039, ¶ 9, 298 P.3d at 503.  The Court concludes that a rational jury could not find that Frank King exercised reasonable diligence, and therefore no genuine dispute exists on this issue.  *See Carpenter v. Boeing Co.*, 456 F.3d 1183, 1192 (10th Cir. 2006) (stating that issue of material fact is genuine only if nonmovant presents facts such that reasonable jury could find in its favor); *Grynberg v. Total S.A.*, 538 F.3d 1336, 1349 (10th Cir. 2008) (concluding no genuine disputed issue regarding sophisticated business person's lack of notice of widely

publicized facts).  There was no genuine issue of disputed fact that Plaintiffs' cause of action accrued, at latest, by March or May of 2009.

The Court further concludes that, even without extensive experience and expertise, a reasonable person who accepted a substantial check but who, as Paula Elmore's affidavit states, "did not know what exactly this related to" would make an inquiry, which would lead to discovery of the unpaid revenues from the Subject Minerals.  The Court concludes that Paula Elmore also had inquiry notice, at least by March or May of 2009.  She received—and executed—a proposed division order in 2007, received a royalty check from Energen in 2007 which Plaintiffs admit was "for the Flora Vista #19-2 and #19-3 Wells covering the period 9/04 – 7/05", and received a check in 2009 from the Texas Comptroller (the unclaimed monies having been claimed in March-May 2009, with payment received on or about June 11, 2009).  [Doc. 81-1, p. 5; Doc. 96, p. 3, ¶ 7; Doc. 81-3, pp. 13-15; Doc. 81, p. 8, ¶ 19; Doc. 94, p. 4, ¶ 19]  In addition, the "requirement of diligence as a co-owner" of the Subject Minerals warrants enforcement of the statute of limitations against her, because if she "had been reasonably diligent as a co-owner, she should have, at a minimum, communicated with her co-owner … regarding the status of her property."  *Yurcic*, 2013-NMCA-039, ¶ 21, 298 P.3d at 506.  This conclusion follows under *Yurcic* even if Paula Elmore did not in fact communicate with Frank King regarding these unexpected windfalls and did not in fact have actual knowledge.  *See id*.  The Court concludes that a rational jury could not find that a reasonable person would have made no inquiry under these circumstances.

### (4)  Conclusion on statute of limitations

The Court concludes that Plaintiffs' claims under the Pooling statute accrued in 1994, and Plaintiffs had inquiry notice in 2001 and certainly by May of 2009.  The four-year statute of limitations bars Count Four.

The Court concludes that Plaintiffs' other claims accrued anew each day.  The Court further concludes that Plaintiffs had inquiry notice of their claims against the Energen Defendants no later than May of 2009, and that Plaintiffs failed to carry their burden to show that reasonably diligent investigation would not have led to discovery of the facts underlying Plaintiffs' claims.  While viewing the relevant facts in the light most favorable to Plaintiffs as non-movants, the Court concludes that, on the undisputed facts, a rational jury could not find that Plaintiffs lacked inquiry notice in March or May 2009.  The four-year statute of limitations thus bars Plaintiffs' claims against the Energen Defendants under Counts Three and Ten for the period before September 10, 2009.

### C.  Laches

The Energen Defendants argue that all of Plaintiffs' claims against them are barred by laches.  They observe that the Lease was executed forty years before Plaintiffs brought this suit, and that Plaintiffs delayed for almost twelve years after receiving the 2001 letter.  As discussed above, the Court concludes that Plaintiffs assert legal (not equitable) claims against the Energen Defendants.

The Court applies New Mexico law in considering the issue of laches.  *See D. Kirk, LLC v. Cimarex Energy Co.*, 604 Fed. Appx. 718, 726 (10th Cir. 2015) (unpublished) (applying Oklahoma law to laches issue in diversity suit); 4 Charles Alan Wright et al., *Fed. Practice & Procedure* § 1045 (3d ed. 2015) (stating that forum state law on laches applies in diversity suit).

The doctrine of laches is especially applicable to mining and oil properties, because of the uncertainty and fluctuations in value of the property. *Patterson v. Hewitt*, 195 U.S. 309, 321 (1904).

The doctrine of laches prevents litigation of a stale claim which should have been brought earlier when the delay has caused prejudice to the defendant. *Garcia v. Garcia*, 1991-NMSC-023, ¶ 30, 808 P.2d 31, 38. "While both defenses, limitations and laches, share a common underpinning in their policy to prevent litigation of stale claims, laches is the more flexible defense, allowing the particular facts of a dispute to be considered in determining whether a party should be foreclosed from bringing a claim because of a delay in asserting his or her rights." *Id.* "It is well established that an action to quiet title may in an appropriate case be barred by the plaintiff's laches." *Id*.

One claiming the defense of laches must show:

(1) Conduct on the part of the defendant, giving rise to the situation of which complaint is made and for which the complainant seeks a remedy;

(2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit;

(3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which [she] bases [her] suit; and

(4) injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit is not held to be barred.

*Id*. ¶ 31, 808 P.2d at 38; *see Martinez v. Martinez*, 2004-NMCA-007, ¶ 21, 83 P.3d 298, 303.

The United States Supreme Court affirmed a New Mexico state court decision barring, on the ground of laches, an accounting and award of one-fourth interest in two mining locations in *Patterson v. Hewitt*, 195 U.S. 309 (1904). The Court affirmed the holding that eight years was too long for the appellants to bring suit on purely equitable claims. Emphasizing the efforts,

perseverance, and expenses of the defendants, the Court stated that it would be "grossly unjust" to award the plaintiffs their original interest in the property when the plaintiffs stood by and contributed nothing to the efforts to develop the mine into a valuable property and put it on a paying basis. *Id*. at 320. The Court further held that it would not impose upon the plaintiffs as a condition of relief that they pay their proportionate share of labor and expenses, because to do so "could not compensate the defendants for the risk assumed by them that their exertions would come to nought." *Id*. at 321. Emphasizing that the principle of laches is particularly applicable to mining property, the Court stated that "the utmost diligence" is required by those seeking an interest after a period of inaction:

> There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which to-day may have no salable value may in a month become worth its millions. Years may be spent in working such property, apparently to no purpose, when suddenly a mass of rich ore may be discovered, from which an immense fortune is realized. Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced.

195 U.S. at 321.

The parties' pleadings discuss application of the four elements of laches to the facts of this case, but do not address a preliminary issue: whether laches can apply to legal claims to shorten a filing period when there is an applicable statute of limitations. In this diversity suit, the Court must apply New Mexico law concerning the doctrine of laches.[20] The Court has concluded that Plaintiffs' claims against the Energen Defendants are barred by the four-year statute of limitations to the extent they concern the time prior to September 10, 2009; the Court therefore does not reach the issue of whether laches would bar such claims. As to claims

---

[20] The Court notes that, in their response to the Gilbreath Defendants' motion for summary judgment [Doc. 193], discussed in Section II, below, Plaintiffs cite a case on the federal laches doctrine. [Doc. 224, p. 20 (citing *United States v. Rodriguez-Aguirre*, 264 F.3d 1195 (10th Cir. 2001))]

concerning the time after September 10, 2009, the Energen Defendants fail to discuss how New Mexico courts would approach the interaction of the judicially created equitable doctrine of laches and legislatively enacted statutes of limitations.  The Energen Defendants failed to show under New Mexico law that laches was an available defense to bar legal claims brought within the four-year statute of limitations.  *Cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, ___ U.S.___, 134 S. Ct. 1962, 1973-74, 188 L. Ed. 2d 979 (2014) (holding—under federal law—that laches is generally not available to bar claim for legal relief filed within applicable statute of limitations).[21]   In the absence of such argument and authority, the Court concludes that the Energen Defendants have not shown that they are entitled to summary judgment under the laches doctrine.

The Court therefore denies the Energen Defendants' motion for summary judgment on the laches issue.

### D.  Market Election

The Energen Defendants make a one-paragraph conclusory argument that they bear no liability for revenue payments to Plaintiffs for production of gas after August 1, 2005, when the Gilbreath Defendants elected to take their gas in kind.  [Doc. 81, p. 15]  Plaintiffs note that they were not parties to the Gilbreath Defendants' marketing election, and argue that the Gilbreath Defendants' election does not relieve the Energen Defendants of liability.  [Doc. 94, p. 21]  As Plaintiffs observe, the Energen Defendants' motion cites no authority.  Although there is additional discussion in the Energen Defendants' reply [Doc. 104, pp. 11-13], Plaintiffs were not given the benefit of this discussion when making their response.

---

[21] The *Petrella* Court distinguished *Patterson v. Hewitt*, 195 U.S. 309 (1904), as barring purely equitable claims and as not involving a federal statute of limitations.  *Petrella*, 134 S. Ct. at 1974-75 n.16.

The Court will not address the Energen Defendants' conclusory argument, without any citation to authority.  *See* D.N.M.LR-Civ. 7.3(a) (requiring motion to cite authority in support of legal positions advanced); *cf. United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) (declining to address one-paragraph argument citing one case, without developed argumentation); *Cahill v. Am. Family Mut. Ins. Co.*, 610 F.3d 1235, 1238-39 (10th Cir. 2010) (court need not address conclusory arguments unsupported by citation to relevant authority).

## II.   *Defendants Gilbreaths' Motion for Summary Judgment*  **[Doc. 193]**

The Gilbreath Defendants move for summary judgment on the basis of the statute of limitations and laches.  [Doc. 193]  Plaintiffs filed a response [Doc. 224], and the Gilbreath Defendants filed a reply [Doc. 256].  Having reviewed the motion, briefs, evidence, and relevant law, the Court concludes that the motion should be granted in part and denied in part.

### A.  Statute of Limitations

Plaintiffs argue that the statute of limitations does not bar their claims, because they were cotenants with the Gilbreath Defendants after the Lease expired, and there was no ouster sufficient to trigger the running of the statute of limitations.  [Doc. 224, pp. 27-28]  Authority cited here by Plaintiffs concerns the type of notice, ouster, or accounting required by a cotenant; Plaintiffs' cases do not support their assertion that expiration of a lease creates a cotenancy between a lessor and lessee in the first place.  Plaintiffs cite authority in another portion of their response in an attempt to show that they were cotenants with the Gilbreath Defendants [Doc. 224, pp. 33-34]; however, Plaintiffs' authority is not persuasive, and the Court concludes that no

36

cotenancy arose.[22]   (*See* Section (C) below.)  Plaintiffs' cases involving cotenancy are therefore inapposite.

### (1)  Count One

Plaintiffs request declaratory relief on two separate issues under Count One.   First, Plaintiffs claim that the Subject Minerals have been unleased since at least July of 1990, and second, they claim that the Subject Minerals are unpooled because they were never properly pooled in 1994.

The Gilbreath Defendants argue that the six-year statute of limitations for actions based on written contracts bars Plaintiffs' claim under Count One for a declaration that the Subject Minerals have been unleased since July of 1990.  *See* NMSA 1978, § 37-1-3A.  The Court has concluded, however, that the Lease expired automatically on July 1, 1990.[23]   The fact of automatic termination is critical.  Since no action was required to terminate the Lease, it does not matter when Plaintiffs eventually filed suit; the six-year statute of limitations under Section 37-1-3A is inapplicable.  The Court denies the Gilbreath Defendants' summary judgment motion on this issue.

The Gilbreath Defendants argue that the statute of limitations bars Plaintiffs' claim under Count One for a declaratory judgment under New Mexico's lease release provisions ("Lease Release Act"), NMSA 1978, § 70-1-3 to -5 (1925).  [Doc. 195, p. 25]  The statute provides that the lessee has a duty to have an oil, gas or other mineral lease released from record, without cost to the owner, if such lease "shall become forfeited."  NMSA 1978, § 70-1-3 (1925); *see* NMSA

---

[22] This conclusion also leads to rejection of Plaintiffs' argument that the Gilbreath Defendants cannot claim a statute of limitations defense because they are equitably estopped by silence.  [Doc. 224, p. 29]  This argument depends on Plaintiffs' argument that there was a fiduciary relationship based on cotenancy.  In addition, the SAC makes no claim of fraudulent concealment.

[23] The Court made this conclusion in a separate Memorandum Opinion and Order contemporaneously filed as Doc. 314 (Section II).

1978, § 70-1-4 (1925) (providing for $100 damages, costs, and attorney fees for failure to execute release).  The Gilbreath Defendants argue that Plaintiffs' claim under the Lease Release Act is based on the claim that the Lease terminated in July 1990 for nonproduction, and that the four-year statute of limitations required suit to be filed by July 1994.  [Doc. 195, pp. 25-26 (citing *Nance v. L.J. Dolloff Assocs., Inc.*, 2006-NMCA-012, ¶ 22, 126 P.3d 1215, 1220 (stating that claims for statutory violations carry a four-year statute of limitations under Section 37-1-4)); Doc. 256, pp. 6-7]  "Declaratory actions are governed by the same limitations applicable to other forms of relief, since the nature of the right sued upon, and not the form of action or relief demanded, determines the applicability of the statute of limitations."  *Taylor v. Lovelace Clinic*, 1967-NMSC-234, ¶ 6, 432 P.2d 816, 818; *see City of Albuquerque v. Ryon*, 1987-NMSC-121, ¶ 9, 747 P.2d 246, 249.

Plaintiffs invoke the discovery rule, as they did in their response to the Energen Defendants' summary judgment motion.  [Doc. 224, pp. 30-31]  The Gilbreath Defendants' reply argues that Plaintiffs had inquiry notice at least by the time of the 2001 McHugh letter, and that Plaintiffs failed to show that they would have been unable to discover the facts underlying their claim through diligent investigation; thus Plaintiffs' claim is barred by the four-year statute of limitations.  [Doc. 256, pp. 7-10]  For essentially the same reasons discussed above, in addressing the discovery rule in relation to the Energen Defendants' summary judgment motion, the Court concludes that the 2001 McHugh letter gave Plaintiffs inquiry notice that the Lease had terminated for lack of production, that a claim for release of the Lease accrued in 2001, and that the catchall statute of limitations bars Plaintiffs' claim brought on September 10, 2013.  (*See* Section I, above; *see also* the separate Memorandum Opinion and Order contemporaneously

filed as Doc. 316 (Section II) (discussing Plaintiffs' summary judgment motion on the Lease Release Act).)

The Court grants the Gilbreath Defendants' summary judgment motion with respect to Sections 70-1-3 and 70-1-4 of New Mexico's Lease Release Act.

### (2) Count Two

The Gilbreath Defendants argue that Plaintiffs' claim for a decree quieting title under Count Two is barred by the ten-year statute of limitations of New Mexico's adverse possession statute, NMSA 1978, Section 37-1-22. The Court has concluded that the Lease automatically terminated on July 1, 1990, and no action was required by Plaintiffs to terminate the Lease.[24] Section 37-1-22 is simply inapplicable. The Court denies the Gilbreath Defendants' summary judgment motion on Count Two.

### (3) Counts Four, Five, Six, Seven, Nine, and Ten

The Gilbreath Defendants argue that the four-year statute of limitations of NMSA 1978, § 37-1-4, bars Plaintiffs' claims under: Count Four—Breach of § 70-2-18(B) (Pooling statute); Count Five—Trespass; Count Six—Conversion; Count Seven—Breach of Fiduciary Duty; Count Nine—Breach of Oil and Gas Proceeds Payment Act; and Count Ten—Negligence. Plaintiffs' response invokes the discovery rule. [Doc. 224, p. 26]

Most of the relevant undisputed material issues of fact are set forth above. (*See* Section I.) In addition, Plaintiffs admit that "Frank King has knowledge and experience in searching public records to discover whether there has been oil and gas production on a particular property." [Doc. 195-5, p. 2] While denying that he had a duty to do so, Plaintiffs admit that Frank King did not search public records for information about production on the property that is

---

[24] The Court made this conclusion in a separate Memorandum Opinion and Order contemporanously filed as Doc. 314 (Section II).

the subject of the Lease.  [Doc. 195, p. 9, ¶¶ 16-17; Doc. 224, p. 4, ¶¶ 16-17]  After receiving the royalty payment for the Flora Vista wells in 2007, Paula Elmore did not contact Energen Resources to ask any questions.  [Doc. 195, p. 13, ¶ 49; Doc. 224, p. 8, ¶ 49]  On or about January 18, 2007, Paula Elmore signed a division order "setting out her interest in the Flora Vista wells #19-2 and #19-3 that involved the property described in the Calvin lease."  [Doc. 195, p. 13, ¶ 50; Doc. 224, p. 8, ¶ 50]  While denying that she had a duty to do so, Plaintiffs admit that after signing this division order Paula Elmore took no action to investigate production on the property.  [Doc. 195, p. 13, ¶ 51; Doc. 224, p. 8, ¶ 51]

It is undisputed that Frank King:  has more than fifty years of experience in the oil and gas industry; is a member of the Society of Petroleum Engineers and the American Institute of Mining Engineers; was Vice President of Exploration for Republic Energy located in Dallas, Texas during the 1990s and later became President (CEO) of Republic Energy—which is a Texas oil and gas exploration company with approximately twenty to fifty employees; has been a member of the Board of Directors of Republic Energy for twenty years; and has been involved in looking after several hundred oil and gas leases since 1962.  [Doc. 195, p. 14, ¶¶ 54-59; Doc. 224, pp. 8-9]

Plaintiffs' claims against the Gilbreath Defendants are not the same as those against the Energen Defendants; however, the claims are similar in being based on Plaintiffs' claims that they are entitled to revenues for production.  Claims for royalties under the Lease would be barred by the six-year statute of limitations for a contract claim; however, Plaintiffs make no contract claim.  Plaintiffs are therefore limited to claims for revenues for production after July 1, 1990.[25]

---

[25]Paula Elmore, however, has no claim to any revenues before December 28, 2006, because she did not have title to the Subject Minerals until Frank King conveyed a 50% interest in them on that date.  [Doc. 182-14]

The issues and arguments are essentially the same as those raised in the briefs on the Energen Defendants' summary judgment motion.  (*See* Section I, above.)  The Court concludes that the four-year "catch-all" statute of limitations of Section 37-1-4 applies to the tort claims and to the two statutory claims for which New Mexico law sets no explicit statute of limitations. (*See* Section I(B), above.)  The Court disagrees with the Gilbreath Defendants' argument that Plaintiffs' claims accrued as early as 1973 or July 1990.  Instead, as discussed above, the Court concludes that Plaintiffs' claims generally accrued anew each day[26] (with the exception that the claim under the Pooling statute accrued in 1994), and Plaintiffs fail to carry their burden to show that reasonably diligent investigation would not have led to discovery of the facts underlying their claims.  (*See* Section I(B), above.)  On essentially the same analysis applied to the Energen Defendants' summary judgment motion, the Court concludes that Plaintiffs had inquiry notice no later than March or May of 2009 of claims against the Gilbreath Defendants under Counts Four, Five, Six, Seven, Nine, and Ten.  The additional facts presented by the Gilbreath Defendants about Frank King's experience and expertise strengthen this conclusion.

The Court concludes that the four-year statute of limitations bars Plaintiffs' claims for the period before September 10, 2009, under Counts Four, Five, Six, Seven, Nine, and Ten.

**B.  Laches**

The Gilbreath Defendants argue that laches bars Plaintiffs' claims under Counts One, Two, Three, and Eight.  The Court set out the applicable legal standards above, in discussing the Energen Defendants' summary judgment motion.  (*See* Section I(C), above.)

---

[26] The Gilbreath Defendants argue that the continuing violation doctrine is not applicable.  [Doc. 195, p. 30]  The Court so concluded in discussing the Energen Defendants' summary judgment motion.  (*See* Section I(B), above.)

**(1) Counts One and Two**

The Court concluded that the Lease expired automatically on July 1, 1990.[27]  The fact of automatic termination is critical.  Cases cited by the Gilbreath Defendants are inapposite, because they do not involve automatic termination.  The Court concludes that laches is not a defense to Plaintiffs' claim of automatic termination.  As observed by a noted commentator:

> No cases have been found in which the court has found that the doctrine of laches is a defense to the lessor's claim that a lease has terminated pursuant to the special limitation in the habendum clause.  Since termination of a lease by operation of the limitation provision of the habendum clause is automatic, the lessor's delay in bringing suit appears immaterial.  Any defense that the lessor has waived his right to assert termination of the lease would seem inapplicable.

3 Howard R. Williams & Charles J. Meyers, *Oil & Gas Law* § 604.7, p. 88.22 (updated 2014) (hereinafter "Williams & Meyers") (footnotes omitted); *see Freeman v. Samedan Oil Corp.*, 78 S.W.3d 1, 11 (Tex. App. 2001) (holding that once a lease automatically terminates, it cannot be revived by principles of estoppel, waiver, or laches).  The Court is persuaded by this analysis. Since no action was required for Plaintiffs to terminate the Lease, it does not matter when they eventually filed suit; the doctrine of laches is inapplicable to the issue of ownership of the Subject Minerals.  The Court therefore concludes that Plaintiffs are entitled to a ruling that the Subject Minerals have been unleased since that date.

The Gilbreath Defendants argue that New Mexico's adverse possession statute, Section 37-1-22, "forever bars any person who claims legal or equitable title to property they do not possess and who has not filed suit against another person possessing the property within 10 years, from ever filing such lawsuit."[28]   [Doc. 195, p. 26]   Because the Lease expired automatically, with no action required by Plaintiffs, Section 37-1-22 is inapplicable and presents

---

[27] The Court made this conclusion in a separate Memorandum Opinion and Order contemporanously filed as Doc. 314 (Section II).
[28] The Court concludes that the Gilbreath Defendants did not obtain title to the Subject Minerals by adverse possession, in a separate Memorandum Opinion and Order contemporaneously filed as Doc. 314 (Section I).

no bar to Plaintiffs' quiet title claim.  The Court concludes that Plaintiffs are entitled to a ruling quieting title to the Subject Minerals against adverse claims by Defendants in this suit.

### (2) Counts Three (Accounting) and Eight (Unjust Enrichment)

The Gilbreath Defendants argue that Plaintiffs waited forty years to bring their claims; the Plaintiffs paid nothing for the mineral rights; that the Gilbreath Defendants expended enormous amounts of time, effort, and money to develop, operate, and produce gas; that Plaintiffs sat by idly, although they could have discovered the facts by searching public records or inspecting the property or contacting the lessee; and that they are prejudiced by the death of Norman Gilbreath in 2014, the person with the greatest degree of relevant knowledge.  [Doc. 195, pp. 20-24; Doc. 256, pp. 1-4, 12-17]

Plaintiffs argue that the Gilbreath Defendants have not carried their burden to prove laches, and that the laches defense must be considered in light of the public policy in favor of quieting title to land.  [Doc. 224, pp. 15-16]  Plaintiffs argue that they did not have information warranting investigation of the status of the Subject Minerals and the Lease, so that they did not unreasonably delay in asserting their rights; that the Gilbreath Defendants do not show how they lacked knowledge that Plaintiffs would assert their rights; and that the Gilbreath Defendants fail to show prejudice.  [Doc. 224, pp. 17-20]

Plaintiffs also argue that laches is inapplicable, because they were cotenants with the Gilbreath Defendants after the Lease expired, and there was no ouster.  [Doc. 224, pp. 21]  As discussed more fully below, Plaintiffs' cases do not support their assertion that expiration of a lease creates a cotenancy between a lessor and lessee in the first place.  Plaintiffs' authority is not persuasive, and the Court concludes that no cotenancy arose.  (*See* Section (C) below.)

The Court must view the evidence in the light most favorable to Plaintiffs, as non-movants.  Plaintiffs presented evidence that the Gilbreath Defendants, though maintaining a suspense account for Plaintiffs, did not attempt to contact Plaintiffs.  [Doc. 224, pp. 12, 20; Doc. 224-5, pp. 2, 4; Doc. 224-9, p. 1; *see also* Doc. 209]

The third element of laches is "lack of knowledge or notice on the part of" the Gilbreath Defendants that Plaintiffs would assert their right.  *Garcia*, 1991-NMSC-023, ¶ 30, 808 P.2d at 38.  The Gilbreath Defendants refer to a number of ways in which Plaintiffs could have discovered their cause of action—discussed above, in relation to the inquiry notice issue under the discovery rule.  But this argument appears to relate to the second element, "delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit." *Garcia*, 1992-NMSC-023, ¶ 30, 808 P.2d at 38.  To be separately listed in New Mexico cases, the third element must state an additional requirement—not merely refer to length of time, or to notice to Plaintiffs.  "'[D]elay or lapse of time alone does not constitute laches . . . .'"  *Brown v. Taylor*, 1995-NMSC-050, ¶ 24, 901 P.2d 720, 724 (quoting *Galef v. Buena Vista Dairy*, 1994-NMCA-068, ¶ 11, 875 P.2d 1132, 1136)).  For instance, if the Gilbreath Defendants showed that they had information that Plaintiffs in fact had acquired knowledge of unpaid revenues or of the Gilbreaths' operations, and yet no suit was filed for many years, such a showing might satisfy the third element.  But the Gilbreath Defendants make no such showing or argument. The Gilbreath Defendants have not made a persuasive showing on this element, appearing merely to assume that it is sufficient if Plaintiffs could have discovered their operations.

Relying on *Magnolia Mountain Limited Partnership*, the Gilbreath Defendants argue that they could "infer waiver or acquiescence of rights" by Plaintiffs because of the long delay before

Plaintiffs filed this suit.   [Doc. 256, p. 14]   In that case the New Mexico Court of Appeals rejected the laches defense for the same reason it rejected "waiver by acquiescence," which "arises when a person knows he is entitled to enforce a right and neglects to do so for such a length of time that under the facts of the case the other party may fairly infer that he has waived or abandoned such right."   *Magnolia Mountain Ltd. P'ship v. Ski Rio Partners, Ltd.*, 2006-NMCA-027, ¶¶ 29-32, 131 P.3d 675, 683-84 (internal quotation marks omitted).   The court also stated that "a trial court should not infer acquiescence from doubtful or ambiguous acts."   *Id.* ¶ 29, 131 P.3d at 683 (internal quotation marks omitted).   The New Mexico Court of Appeals concluded that the plaintiff's delay was at best "doubtful or ambiguous," and the defendant failed to show that the plaintiff's delay in filing suit "could have given [the defendant] any reasonable expectation that [the plaintiff] had decided to permanently [forgo] the remedy of foreclosure." *Id.* ¶ 32, 131 P.3d at 684; *see Garcia v. Garcia*, 1991-NMSC-023, ¶ 34, 808 P.2d 31, 39 (stating continuing discussions without articulating dispute about property ownership supported showing of lack of notice plaintiff would assert right).   Similarly, the Court concludes that the Gilbreath Defendants fail to show why Plaintiffs' delay gave the Gilbreath Defendants a reasonable expectation that Plaintiffs had decided to permanently forgo collection of revenues.   The Court concludes that the Gilbreath Defendants improperly conflate the second and third elements of the laches doctrine.   When "the only effect of plaintiff's delay in its move to collect … was to allow defendants to collect the proceeds" in the meantime, the defendants "are not in a position to complain that plaintiff's delay permitted them to enjoy the benefit of this royalty to which they are not entitled."   *Williams' Adm'r v. Union Bank & Trust Co.*, 143 S.W.2d 297, 302 (Ky. Ct. App. 1940) (rejecting bar of laches); *see* 3 Williams & Meyers § 658.5, at 748.9 n.9.   It was the

burden of the Gilbreath Defendants to identify evidence on the third element that was "so one-sided" that there was no genuine dispute about a material fact. *See Anderson*, 477 U.S. at 250.

The Court recognizes that many years passed before Plaintiffs brought suit. The Court also recognizes that the Gilbreath Defendants acquired many years of revenue after the Lease expired. Laches is concerned not merely with the passage of time, but with whether it is inequitable to permit a claim to be enforced. *Mechem v. City of Santa Fe*, 1981-NMSC-104, ¶ 15, 634 P.2d 690, 693; *see Winn v. Shugart*, 112 F.2d 617, 623 (10th Cir. 1940).

The Court concludes that the Gilbreath Defendants have not carried their burden to show that it would be inequitable to permit Plaintiffs' claims under Counts Three and Eight to go forward. The facts and circumstances are not so clear to the Court to reach such a conclusion, based on the record currently before the Court. *See Garcia*, 1991-NMSC-023, ¶ 30, 808 P.2d at 38 (stating that court must consider particular facts of each case in deciding claim of laches). The Court denies the Gilbreath Defendants' summary judgment motion on the laches issue.

### C.  Count Seven—Breach of Fiduciary Duty

The Gilbreath Defendants move for summary judgment on Breach of Fiduciary Duty, arguing that Count Seven "should be dismissed because there are no material facts to support that claim." [Doc. 195, p. 31; Doc. 193, p. 2] They argue: "Fiduciary duties do not arise from oil and gas leases." [Doc. 195, p. 31] They allege that Plaintiffs did not place their trust and confidence in the Gilbreaths, and that assignment of the Lease did not create a fiduciary relationship. The Gilbreath Defendants argue that there is no cotenancy between a lessor and lessee or between a tenant-at-will and a lessor/landlord. [Doc. 256, p. 17] The Gilbreath Defendants observe that Plaintiffs try to construct a cotenancy relationship between them as a

46

defense to the claim of laches, as a defense to the claim under the statute of limitations, and as the basis for Plaintiffs' claim of a fiduciary relationship.

Responding to the Gilbreath Defendants' citation of caselaw "for the proposition that fiduciary duties do not arise from oil and gas leases," Plaintiffs state:  "But that is not the basis for Plaintiffs' breach of fiduciary duty claim against the Gilbreaths."  [Doc. 224, p. 33]  Plaintiffs state that Count Seven is not based on the Lease, because the Lease automatically expired by July 1, 1990.  Instead, Plaintiffs base Count Seven on their assertion that after the Lease expired the Gilbreaths became Plaintiffs' cotenants, and that cotenants have a fiduciary relationship. [Doc. 224, p. 33]  Plaintiffs allege:  that the Lease automatically expired by July 1, 1990; that the Gilbreath Defendants "admit that they have been holding royalty monies in suspense payable to Plaintiffs since 2006"; and that the Gilbreath Defendants became parties to joint operating agreements regarding the Subject Minerals and represented that as of August 1, 2005, they would assume sole responsibility for paying revenues due to Plaintiffs but have made no such payments.  [Doc. 224, pp. 33-35]  Plaintiffs argue that these facts support their claim under Count Seven for Breach of Fiduciary Duty.

In deciding this summary judgment motion, the Court accepts these factual allegations as true.  *See Shero*, 510 F.3d at 1200 (court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that party).  Plaintiffs do not suggest that other allegations are relevant on this issue.

Whether a party owes a fiduciary duty is a question of law.  *Moody v. Stribling*, 1999-NMCA-094, ¶ 17, 985 P.2d 1210, 1216.  A fiduciary relationship may exist in a variety of contexts, if "'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the

47

confidence.'"  *Alcantar v. Sanchez*, 2011-NMCA-073, ¶ 43, 257 P.3d 966, 975 (quoting *Moody*, 1999-NMCA-094, ¶ 18, 985 P.2d at 1216); *Moody*, 1999-NMCA-094, ¶ 17, 985 P.2d at 1216. The determination of whether a fiduciary duty exists "turns on 'whether the relationship between the parties is one of trust and confidence.'"  *Alcantar*, 2011-NMCA-073, ¶ 43, 257 P.3d at 975 (quoting *Moody*, 1999-NMCA-094, ¶ 17, 985 P.2d at 1216).

Plaintiffs would have the burden at trial to demonstrate first, that a fiduciary relationship existed, and second, that it was breached.  Plaintiffs must show a basis for a legal determination that there was a fiduciary relationship.  And since the Gilbreath Defendants would not bear the burden of persuasion at trial, they can satisfy their burden on their summary judgment motion by identifying a lack of evidence on an essential element of Plaintiffs' claim.  *See Adler*, 144 F.3d at 671.  As the Gilbreath Defendants observe, Plaintiffs provide no persuasive authority that a cotenancy arises between lessor and lessee after an oil or gas lease automatically terminates, either as a general matter or under the particular circumstances of this case.

In an ancient case cited by Plaintiffs, the California District Court of Appeal did say that the sublessees became "mere tenants of the land at sufferance" after the lease expired according to its terms; however, the case also described the "thereafter" clause as a "condition precedent to the extension of the lease."  *Moon v. Marker*, 78 P.2d 460, 462 (Cal. Dist. Ct. App. 1938) (involving suit in ejectment, under lease providing for ten-year term "and so long thereafter as oil or gas be produced … in paying quantities").  Although *Moon* did refer to the "thereafter" clause as providing for automatic termination, the California court did not view the lease as conveying a fee simple determinable interest, as New Mexico law does.  *Maralex Res. Inc. v. Gilbreath*, 2003-NMSC-023, ¶ 9, 76 P.3d 626, 630.  *Moon* does not hold that the lessee and lessor became

cotenants.  In addition, the reference to tenancy at sufferance was dictum; *Moon* involved the issue of demand and notice to surrender possession of the property.

Similarly, Plaintiffs cite dictum in *Continental Oil Co.*—a case involving a complicated procedural history and involving leave to file a supplemental bill.  *Continental Oil Co. v. Osage Oil & Ref. Co.*, 69 F.2d 19, 23 (10th Cir. 1934).  The Tenth Circuit merely referred in dictum to a lessee continuing in possession after the lease expires upon cessation of production; the case does not say that the lessee becomes a cotenant.  The case is old, and possibly applies Oklahoma law—which differs from New Mexico law by analyzing a habendum clause containing a "thereafter clause" as conveying an interest subject to a condition subsequent.[29]  The dictum further distinguishes the case, stating that "the lease may be terminated by either party on notice"—not a characteristic of New Mexico's interpretation of such leases as providing for automatic termination.  *Continental Oil Co.*, 69 F.2d at 23.

Nor does the Texas case cited by Plaintiffs support their assertion that a cotenancy arose between Plaintiffs and the Gilbreath Defendants after automatic termination of the Lease.  In *Wagner*, Sheppard owned one eighth of the minerals underlying a particular tract, which was leased along with the other seven eighths and then pooled with interests in adjacent tracts.  *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 421 (Tex. 2008).  Sheppard's lease terminated upon nonpayment of royalties.  The case does not state, much less hold, that she became a cotenant with the prior lessee with respect to her one-eighth interest; instead, it appears that Sheppard became an unleased cotenant with owners of the other seven eighths.  And the focus of the case was not cotenancy, but the effect on the pool when one lease expires.

---

[29]The Court discussed this issue in a separate Memorandum Opinion and Order contemporanously filed as Doc. 314 (Section II) (citing 3 Williams & Meyers § 604, at 44-45; Maralex Res. Inc., 2003-NMSC-023, ¶ 9, 76 P.3d at 630).

Under a cotenancy, there is "unity of possession," with each cotenant having the right to possess the whole. *Bankers Trust Co. v. Woodall*, 2006-NMCA-129, ¶ 7, 144 P.3d 126, 129. The Lease conveyed an interest in real property, giving Calvin (and by assignment the Gilbreath Defendants) a fee simple determinable interest in the Subject Minerals. *See Uhden v. New Mexico Oil Conservation Comm'n*, 1991-NMSC-089, ¶ 8, 817 P.2d 721, 723; *Maralex Res. Inc. v. Gilbreath*, 2003-NMSC-023, ¶ 9, 76 P.3d 626, 630. While the Lease was in effect, Calvin (and after assignment the Gilbreath Defendants) had the exclusive right to, and ownership of, the Subject Minerals. After the Lease automatically terminated on July 1, 1990, the fee simple interest in the Subject Minerals reverted exclusively to Plaintiff Frank King. There is no room in this analysis for a cotenancy or other shared interest in the minerals between lessor and lessee. *See* 3 Williams & Meyers § 604, at 48 (distinguishing fee simple determinable estate and fee simple subject to condition subsequent, and observing that possibility of holdover lessee not immediately becoming trespasser could arise under latter but not former classification); 1 Williams & Meyers § 225 (observing that in most states, since lease is treated as fee simple determinable, if lease terminates the trespass, in theory, begins immediately).

The Court is in agreement with the analysis of a Texas court which rejected the argument that a lessee becomes a holdover tenant, or occupant at sufferance, after automatic termination of a mineral lease. *Natural Gas Pipeline Co. v. Pool*, 30 S.W.3d 618, 630 (Tex. App. 2000), *rev'd on other grounds*, 124 S.W.3d 188 (Tex. 2003). Observing that an oil and gas lease "is tantamount to a sale of real property," the Texas court stated that "the holdover tenancy rules described by appellants with respect to landlord/tenant relationships are not necessarily applicable to the relationship of mineral lessor/lessee," and concluded that the analogy was not applicable. *Id*. Instead, the lessee becomes a trespasser. *Id*. Similarly, another court rejected

50

the analogy to a holdover tenancy after automatic termination of an oil and gas lease for nonproduction; a lessee resuming production becomes a trespasser. *Bryan v. Big Two Mile Gas Co.*, 577 S.E.2d 258, 265-69 (W. Va. 2001).

The second basis for Plaintiffs' claim of a fiduciary relationship is that the Gilbreaths were fiduciaries because since 2006 they held royalties in a suspense account payable to Plaintiffs; as of August 1, 2005, the Gilbreaths represented to the other parties to the JOA including the Flora Vista Wells that the Gilbreaths would assume responsibility for paying royalties to Plaintiffs.   [Doc. 224, p. 34]   Since the Court has concluded that the Lease automatically terminated on July 1, 1990, however, there was no lease or other agreement under which the Gilbreaths owed royalties or other revenues to Plaintiffs.  Authority cited by Plaintiffs in support of their claim for a fiduciary relationship is inapposite.

*Coleman* expressly stated that the relationship between mineral lessor and lessee is purely contractual and not a fiduciary relationship.  *Coleman v. State*, 131 S.W.3d 303, 308 (Tex. Crim. App. 2004).  The *Coleman* court then distinguished such a fiduciary relationship from the reach of the penal statute for felony misapplication of fiduciary property, stating that this statute "does not construe the term 'fiduciary' in such a strict manner."  *Id*.  Interpreting the statute to employ the definition of "fiduciary" in "common parlance," *Coleman* stated that handling money or property for the benefit of another person met this broader definition.  *Id*.  It was only under this interpretation that the *Coleman* court concluded that the appellant was guilty under the penal statute of "acting in a fiduciary capacity" when he held royalty payments in trust—and when he did so while the lease agreements were in effect.  *Id*.  The conviction was affirmed.

Plaintiffs also cite a 1978 Oklahoma case, which is inapposite because it concerns the relationship between a unit operator and a mineral owner.  *Olansen v. Texaco Inc.*, 587 P.2d 976

(Okla. 1978).   Cases involving unitization are distinguished from cases involving voluntary contracts, such as leases and communitization or voluntary pooling agreements.   *See* 4 *Summers Oil & Gas* § 54:4 (3d ed. 2015) (stating that the latter, as voluntary agreements, do not impose any greater obligations than a lease); *cf. Hebble v. Shell W. E & P, Inc.*, 238 P.3d 939, 943 (Okla. Civ. App. 2009) (stating that "oil and gas operators have no fiduciary duty to non-operators arising solely from contracts such as leases, communitization agreements, or joint operating agreements").   As *Olansen* states, the "critical concern" in that case involved "the legal effect of resort to the police powers of the state on the part of a lessee," which modify voluntary lease agreements.   *Olansen*, 587 P.2d at 985.   This is an issue on which caselaw differs; even in Oklahoma the result is not entirely clear.   *See* 9 Williams & Meyers § 990 (discussing Oklahoma cases and statute overruling some holdings on which *Olansen* relied).   At any event, Plaintiffs' citation to *Olansen*, an Oklahoma case on unitization, fails to provide support for Plaintiffs' claim that the Gilbreath Defendants were in a fiduciary relationship with Plaintiffs as a result of a lease.

The Court is aware of New Mexico authority that the lessor and lessee in a mineral lease are not in a fiduciary relationship.   *See Murdock v. Pure-Lively Energy 1981-A, Ltd.*, 1989-NMSC-048, ¶ 13, 775 P.2d 1292, 1295-96; *cf. Atl. Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1162 (10th Cir. 2000) (stating no fiduciary relationship, even in unit operations, in absence of special factors).   Plaintiffs make no argument that there are any special factors showing a fiduciary relationship as a result of the Lease; indeed, Plaintiffs explicitly disclaim any reliance on the Lease—stating the Lease "is not the basis for Plaintiffs' breach of fiduciary duty claim." [Doc. 224, p. 33]   If the Gilbreath Defendants' possession of royalty monies during the existence of the Lease does not give rise to a fiduciary relationship, the Court does not see how such a

relationship could arise after the Lease has expired—and Plaintiffs provide no persuasive argument or authority here.  Plaintiffs' argument would appear to create a fiduciary relationship precisely because one guilty of trespass or conversion has no right to money acquired.  The Court will not adopt this illogical position.

Accepting Plaintiffs' factual allegations, and viewing them in the light most favorable to Plaintiffs, the Court concludes that Count Seven finds no support in the suspense accounts or in the representation to other Defendants that the Gilbreaths would pay what was due to Plaintiffs. Nor did a cotenancy arise after automatic termination of the Lease.  Since Plaintiffs bear the burden of proof on Count Seven, and Plaintiffs provide no tenable basis for the existence of a fiduciary relationship,[30] the Court concludes that the Gilbreath Defendants are entitled to judgment as a matter of law on Plaintiffs' claim of breach of fiduciary duty.  The Court grants the Gilbreath Defendants summary judgment on Count Seven.

### D.  Punitive Damages

The Gilbreath Defendants argue that Plaintiffs have presented no material facts to support their claim of punitive damages.  [Doc. 195, p. 32]  First, the Gilbreath Defendants cite New Mexico authority that punitive damages cannot be recovered from the estate of a deceased tortfeasor. *Jaramillo v. Providence Washington Ins. Co.*, 1994-NMSC-018, ¶¶ 23-26, 871 P.2d 1343, 1350-52; *State Farm Mut. Auto. Ins. Co. v. Maidment*, 1988-NMCA-060, ¶ 25, 761 P.2d 446, 452.  The New Mexico Supreme Court recognized this as the majority rule, and reasoned that the central purposes of punishment and deterrence are not accomplished by allowing

---

[30] Plaintiffs also rely on Jerry McHugh's testimony that an operator has a fiduciary duty to locate and pay revenue to interest owners.  [Doc. 224, p. 34]  Since the existence of a fiduciary duty is a question of law, the Court does not rely on deposition testimony by a witness.

recovery of punitive damages when the tortfeasor has died. *Jaramillo*, 1994-NMSC-018, ¶ 26, 871 P.2d at 1351-52. Plaintiffs make no response to this argument.

The Gilbreath Defendants also argue that Loretta Gilbreath was a stay-at-home mother with minimal involvement in the business, insufficient actions to justify an award of punitive damages against her. Plaintiffs respond that the Gilbreath Defendants view the facts under the wrong standard. There are material disputed facts regarding the extent of Loretta Gilbreath's involvement in the operations. [Doc. 195, pp. 15-16, ¶¶ 70-71, 75, 79; Doc. 224, pp. 10-12, ¶¶ 70-71, 75, 79] Viewing the facts in the light most favorable to Plaintiffs, there are allegations sufficient to allow a reasonable jury to find that Loretta Gilbreath was sufficiently involved in the business, and that her conduct was "willful, wanton, malicious, reckless, oppressive, or fraudulent." *McNeill v. Rice Eng'g & Operating, Inc.*, 2003-NMCA-078, ¶ 32, 70 P.3d 794, 802-03. Loretta Gilbreath testified that she "was aware money was put into suspense for Frank King because they did not know his location and address," and that she nevertheless made no attempt to contact Plaintiffs. [Doc. 195, p. 17, ¶ 81; Doc. 224-5, pp. 2, 4, 6-7, 9] A rational jury could find, at a minimum, that Loretta Gilbreath acted with reckless disregard for Plaintiffs' rights, knowing of potential harm to the interests of Plaintiffs but "nonetheless utterly fail[ing] to exercise care to avoid the harm." *Id.* (internal quotation marks omitted).

Similarly, the Gilbreath Defendants argue that there are no material facts to show that Kathy Belcher, as Manager of Gilbreath Energy, engaged in any conduct that could justify an award of punitive damages. But Plaintiffs identify evidence that Kathy Belcher testified that: Gilbreath Energy sent no notices or payments to Plaintiffs, never to her knowledge made an effort to locate or pay Plaintiffs, and nevertheless maintained a suspense account for Frank King from January 2006 to the present which was not paid. [Doc. 224-9, pp. 1-2] Viewing the

evidence in the light most favorable to Plaintiffs, the Court concludes that these are sufficient allegations to support an award of punitive damages.

The Court grants the Gilbreath Defendants' motion for summary judgment on the issue of punitive damages against the estate of Norman Gilbreath.  The Court otherwise denies the motion for summary judgment on the issue of punitive damages.

**IT IS THEREFORE ORDERED THAT:**

(1)  *Energen Defendants' Motion for Summary Judgment No. 1:  Statute of Limitations  and Laches* [Doc. 81] is **GRANTED in part** and **DENIED in part**, as discussed above; and

(2)  *Defendants Gilbreaths' Motion for Summary Judgment* [Doc. 193] is **GRANTED in part** and **DENIED in part**, as discussed above.

_____
**UNITED STATES DISTRICT JUDGE**